Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DMCA Section 512(h) Subpoena to
YOUTUBE (GOOGLE, INC.)

Case No. 7:18-mc-00268 (NSR)

# MEMORANDUM OF LAW
# IN SUPPORT OF MOTION TO QUASH
# <u>AND TO PROCEED ANONYMOUSLY</u>

Dated:   Brooklyn, New York
        September 28, 2020

**FOSTER GARVEY P.C.**

By:  Malcolm Seymour (MS-3107)
100 Wall Street, 20th Floor
New York, New York 10005-3708
(212) 965-4533
malcolm.seymour@foster.com

*Attorneys for Movant John Doe*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ....................................................................... i

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS ........................................................................4

ARGUMENT ...................................................................................8

    I.    The Subpoena Should be Quashed Because Watchtower Cannot State a Valid
        Claim of Copyright Infringement.............................................................8

      A.  The User Video Makes Fair Use of the JW Video and Is Not Infringement..............11

         1.  *The User Video Makes Non-Commercial, Critical and Transformative Use
             of the JW Video* .......................................................................12

         2.  *The JW Video is Informational and Non-Commercial in Nature* ..........................13

         3.  *The User Video Excerpts an Insubstantial Portion of the JW Video* .....................14

         4.  *The User Video Is Not a Replacement for the JW Video and Does Not
             Impact the Non-Commercial "Market" for the JW Video* .....................................15

      II.  The Subpoena Should Be Quashed Because Watchtower Has Misrepresented
         its Purpose .............................................................................17

      III. If the Subpoena Is Not Quashed, Movant Should Be Permitted to Appear
          Anonymously in Future Proceedings ......................................................18

CONCLUSION.................................................................................21

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Arista Records, LLC v. Doe 3* ........................................................................9, 10, 11, 16
604 F.3d 110 (2d Cir. 2010)

*Art of Living Foundation v. Does 1-10* .........................................................................11
Case No. 10-CV-5022 (LHK), 2011 WL 5444622 (N.D.Cal. Nov. 9, 2011)

*Authors Guild, Inc. v. HathiTrust* ...............................................................................14
755 F.3d 87 (2d Cir. 2014)

*Bill Graham Archives v. Dorling Kindersley Ltd.* .................................................13, 14
448 F.3d 605 (2d Cir. 2006)

*Blanch v. Koons* ..................................................................................................13, 15, 16
467 F.3d 244 (2d Cir. 2006)

*Brownmark Films, LLC v. Comedy Partners* .................................................................10
682 F.3d 687 (7th Cir.2012)

*Campbell v. Acuff-Rose Music, Inc.* ......................................................................12, 14, 16
510 U.S. 569 (1994)

*Cariou v. Prince* ...........................................................................................................10, 15
714 F.3d 694 (2d Cir. 2013)

*Castle Rock Entertainment v. Carol Publishing Group, Inc.* ......................................16
150 F.3d 132 (2d Cir. 1998)

*Doe v. Bedford Central School District, et al.* ........................................................19, 20
Case No. 18-CV-11797 (VB), 2019 WL 493819 (S.D.N.Y. Feb. 8, 2019)

*Harbus v. Manhattan Institute for Policy Research* ..........................................10, 14, 15
Case No. 19-CV-6124 (ER), 2020 WL 1990866 (S.D.N.Y. Apr. 27, 2020)

*Harper & Row Publishers, Inc. v. Nation Enters.* ......................................................12
471 U.S. 539 (1985)

*Hosseinzadeh v. Klein* ....................................................................................................15
276 F.Supp.3d 34 (S.D.N.Y. 2017)

*Hughes v. Benjamin* ...........................................................................................10, 14, 15
437 F.Supp.3d 382 (S.D.N.Y. 2020)

*In re DMCA Subpoena to Reddit, Inc.* ....................................................................................11
441 F.Supp.3d 875 (N.D.Cal. 2020)

*Lenz v. Universal Music Group* .............................................................................................10
815 F.3d 1145 (9th Cir. 2016)

*Malibu Media LLC v. Doe No. 4* ...............................................................................18, 19, 21
Case No. 12-CV-2950 (JPO), 104 U.S.P.Q. 1941, 2012 WL 5987854 (S.D.N.Y. Nov. 30, 2012)

*McIntyre v. Ohio Elections Comm'n* ........................................................................................8
514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)

*New York Times v. Sullivan* ...................................................................................................8
376 U.S. 254 (1964)

*NXIVM Corp. v. Ross Institute* ...........................................................12, 13, 14, 15, 16
364 F.3d 471 (2d Cir. 2004)

*Sealed Plaintiff v. Sealed Defendant* .................................................................................19
537 F.3d 185 (2d Cir. 2008)

*Signature Management Team, LLC v. Automattic, Inc.* .................................................18
941 F.Supp.2d 1145 (N.D. Cal. 2013)

*Sony Music Entertainment Inc. v. Does 1-40* ..................................................................8, 9
326 F.Supp.2d 556 (S.D.N.Y. 2004)

*Talley v. California* ...............................................................................................................9
362 U.S. 60 (1960)

*U.S. v. Raniere* ....................................................................................................................12
Case No. 18-CR-204 (S-2) (NGG), Doc. No. 735 (E.D.N.Y. June 20, 2019)

*Yang v. Mic Network, Inc.* .......................................................................................10, 14, 15
405 F.Supp.3d 537 (S.D.N.Y. 2019)

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton* ...............................3, 8
536 U.S. 150 (2002)

### Court Documents

Petitioner's Br., *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton* .........9
No. 00-1737 (U.S. Nov. 29, 2001)

*Rules, Statutes, Treatises, Misc., Etc.*

17 U.S.C. §§ 100, *et seq.* ............................................................................................. 1, 7

17 U.S.C. § 103(3) ....................................................................................................... 14

17 U.S.C. § 107 ..................................................................................................... 9, 10, 11

17 U.S.C. § 512(h) ....................................................................................................... 17

Fed. R. Civ. P. 10(a) ................................................................................................... 1, 18

Fed. R. Civ. P. 45(d)(3) ............................................................................................... 1

Fed. R. Civ. P. 45(d)(3)(A)(iii) .................................................................................... 8

Howard B. Abrams, The Law of Copyright, § 15:52 (2006) ......................................... 14

## INTRODUCTION

Movant John Doe respectfully submits this motion (the "Motion"), pursuant to Fed. R. Civ. P. 45(d)(3) and 10(a), to quash the subpoena (the "Subpoena") issued under caption of this action on June 20, 2018 or, in the alternative, for leave to proceed anonymously.

Movant is a lapsed Jehovah's Witness ("JW") who publishes satirical videos critical of JW on YouTube, a website that hosts user-created video content.[1]  Watch Tower Bible and Tract Society of Pennsylvania ("Watchtower"), is a tax-exempt organization that publishes JW instructional materials, and coordinates JW preaching and proselytizing efforts.[2]  Watchtower requested the disputed Subpoena to obtain Movant's name and identifying information under the pretext such information would be used "only for the purpose of protecting Watch Tower's rights under title 17 U.S.C. §§ 100, *et seq.*"[3]  But of the 60 DMCA subpoenas (the "DMCA Subpoenas") that Watchtower has requested (and largely obtained) since commencing a campaign to unmask its anonymous critics in 2017, not one has resulted in an actual claim of copyright infringement against any of the parties identified.[4]  The absolute absence of follow-through on any of the DMCA Subpoenas belies their stated purpose as tools of copyright enforcement.  Watchtower has sought the DMCA Subpoenas, including the Subpoena at issue here, for the purpose of doxing and punishing dissident JWs using a shunning practice known as "disfellowshipping."[5]

---

[1] *See* <u>Declaration of Malcolm Seymour in Support of Motion to Quash Subpoena and Proceed Anonymously</u> ("Seymour Decl."), ¶¶ 5-6.

[2] *See* <u>id.</u>, ¶ 4 & fn. 3.

[3] Doc. No. 1-2, p. 2, ¶ 4 (June 15, 2018 Declaration of Paul D. Polidoro).

[4] *See* <u>Seymour Decl.</u>, ¶¶ 32-37 & Exh. 9.  Indeed, the statute of limitations has run on at least three of these 60 claims. *See* <u>id.</u>, ¶ 37 & fn. 19.

[5] *See* <u>id.</u>, ¶¶ 22-26 (describing the JW practice of identifying and disfellowshipping "apostates").

The video that was the subject of the instant Subpoena (the "User Video") is a prototypical case of fair use under settled law of the Second Circuit.  The User Video excerpts small portions of a Watchtower religious broadcast (the "JW Video") for purposes of criticizing and lampooning the JW Video and JW doctrine more generally.[6]  The transformative creation of new works through sampling and criticism of existing works lies at the heart of the fair use doctrine.  The animating purpose of this doctrine is to encourage discourse around matters of social significance by reconciling the safeguards of copyright law with the freedoms of speech and expression secured by the First Amendment.  The User Video epitomizes the type of speech that fair use and the First Amendment exist to protect.

If the publications targeted by Watchtower's other DMCA Subpoenas offer commentary of a similarly satirical or critical nature, that might explain why Watchtower has not pursued them with claims of copyright infringement.  Such claims almost certainly would have failed.  But the vindication of copyright is not Watchtower's objective: Watchtower freely permits visitors to download and share the JW Video and other materials from its website, without any safeguards or even advisories against infringement.  And the remedies available under the Copyright Act are inconsequential to Watchtower: once the names of alleged infringers are known, Watchtower can visit more serious and lasting penalties than the statutory fines.  Disfellowshipping dissident JWs, makes an example out of Watchtower's critics in a way that civil penalties cannot do.

Tellingly, Watchtower has not attempted (or has attempted unsuccessfully) to take down the YouTube video (the "Cedars Video") that originally released the JW Video footage excerpted by the User Video.[7]  The Cedars Video reproduces the 53-minute JW Video nearly in its entirety,

---

[6] *See* id., ¶ 7 & Exh. 11 (access-restricted upload of the User Video for purposes of the Court's review).

[7] *See* id., ¶¶ 13-17 & fn. 12.

interspersed with critical analysis by another JW dissent.[8] And while the creator of the Cedars Video openly reveals his face and legal name on his YouTube channel,[9] upon information and belief Watchtower has never sued him for copyright infringement.[10] It strains credibility for Watchtower to argue that it earnestly intends to bring copyright enforcement proceedings against the Movant when it has taken no legal action against the creator of the Cedars Video.

An unfortunate irony looms over the Watchtower's DMCA doxing campaign: the Jehovah's Witnesses, through Watchtower and its subsidiaries, have been responsible for several landmark First Amendment victories over the last century, including the Supreme Court's decision in *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) ("Stratton"). Striking down an ordinance that would have required door-to-door canvassers to obtain permits and identify themselves in a public registry, the Court in *Stratton* upheld the right of JW missionaries to engage in anonymous proselytizing and political speech. Watchtower has fought to defend the constitutional rights of JWs to anonymously advocate on behalf of their religion. The same rights must also protect JWs who anonymously advocate against the religion. The Watchtower's drive to unmask and root out dissidents within its own ranks does a disservice to the church's legacy as a defender of anonymous speech. And it is a misuse of the DMCA's subpoena mechanism.

The fair use doctrine creates a safe harbor for transformative critical use of copyrighted works, recognizing the value of this criticism to free speech and social discourse. If fair use and the First Amendment protect the Movant's right to voice these criticisms, they also protect his

---

[8] *See* id., ¶ 14 & fn. 10.

[9] *See* id., ¶ 17 & Exh. 6.

[10] *See* id.

right to voice them anonymously. This is an additional reason to quash the subpoena: unmasking an anonymous speaker before there has been a finding of infringement (especially where, as here, there is overwhelming evidence of fair use) irreparably deprives him of the First Amendment right he is seeking to vindicate.

In the instant case, Movant's anonymity has serious real-world consequences. Exposure of Movant's identity would likely lead to his disfellowshipping, resulting in the permanent loss of friend and family relationships. Actively practicing JWs who do not live in Movant's home (including his parents and other relatives) would be required by religious rule to shun and avoid him. In all likelihood, he would be unable to speak to his parents for the remainder of his or their lives. In light of the constitutional protections afforded to anonymous speech, the prospect of irreparable harm to Movant if his identity were revealed in these proceedings, and Watchtower's negligible likelihood of success on any future claim of infringement, the Court should grant Movant leave to appear anonymously in this and any subsequent proceedings, even if it permits Watchtower to obtain limited identifying information by the Subpoena.

Wherefore, and for the reasons set forth below, Movant respectfully requests that the Court quash the Subpoena or, in the alternative, grant Movant leave to proceed anonymously.

### STATEMENT OF FACTS

Movant publishes his videos under the pseudonymous YouTube account "kevin McFree" (the "Account").[11] Most of Movant's videos are stop-frame Lego animations set in a fictitious village called "J-Dubtown," or simply "Dubtown."[12] They feature humorous voiceover that caricatures and criticizes JW practices. On May 18, 2018, Movant posted a video to the Account

---

[11] *See* id., ¶ 6.

[12] *See* id., ¶¶ 11, 15, fn. 6 & Exh. 5 (depicting representative videos from Movant's Account).

titled "DUBTOWN – Family Worship July Broadcast" (the aforementioned User Video).[13] The User Video is a stop-frame Lego animation that depicts Dubtown characters viewing portions of a video titled "JW Broadcasting – July 2018" (the aforementioned JW Video).[14] The 13-minute User Video excerpts roughly seven and a half minutes of footage from the 53-minute JW Video.[15] Movant interjects, superimposes and overdubs parodic commentary over much of the excerpted footage.[16] Among other topics, the User Video criticizes JW depictions of violence against women,[17] the removal of a man of African descent from JW iconography,[18] the religion's attitude toward technology,[19] and the religion's attitude toward outside academic pursuits among its adherents.[20] On June 11, 2018, less than a month after its release, YouTube removed the User Video at Watchtower's request.[21] The Subpoena at issue in this proceeding was directed at YouTube, requesting disclosure of Movant's name, email address, contact information, IP addresses, and other identifying information.[22]

Watchtower hosts the JW Video on its own website free of charge, with prominent links welcoming viewers to download and distribute the file.[23] While it may be freely downloaded and

---

[13] See id., ¶ 11 & Exh. 11.

[14] See id., ¶ 11 & Exh. 11; Exh. 12 (access-restricted upload of the JW Video for purposes of the Court's review).

[15] See id., ¶¶ 11, 12.

[16] See id., ¶ 11 & Exh. 11.

[17] See User Video, id., Exh. 11, at 4:05.

[18] See id. at 3:20.

[19] See id. at 6:10.

[20] See id. at 4:50.

[21] See Seymour Decl., ¶ 6.

[22] See Doc. No. 1-1 (proposed subpoena in substantially identical form to the Subpoena issued).

[23] See Seymour Decl., ¶ 14 & Exh. 3.

shared from the Watchtower website, the JW Video contains no copyright advisory warning against its reproduction or republication, or the creation of derivative works.[24] Movant obtained JW Video footage from an April 4, 2018 posting (the aforementioned Cedars Video) on the "John Cedars" YouTube Channel.[25] The Cedars Video reproduces most if not all of the 53-minute JW Video, punctuated by extended critical commentary.[26] Though the Cedars Video reproduces a much greater portion of the JW Video, and has garnered far more views than any video uploaded to the Movant's Account,[27] the Cedars Video has not been removed from YouTube.[28] Significantly, while the creator of the Cedars Video personally appears in his videos and reveals his actual name in the introduction to his YouTube channel,[29] Watchtower has never – upon information and belief – commenced copyright infringement proceedings against him.[30]

In fact, based on a review of PACER Case Locator records, it appears that Watchtower has not commenced copyright infringement proceedings in connection with any of the 60 DMCA subpoenas (the "DMCA Subpoenas") it has requested (and usually obtained without opposition) from this and other District Courts since 2017.[31] For several of these DMCA Subpoenas, Watchtower's time to commence enforcement proceedings has now expired.[32] Watchtower's

---

[24] See id., fn. 7 & Exh. 12.

[25] See id., ¶ 13 & fn. 9.

[26] See id., ¶¶ 32-37 & Exh. 9.

[27] See id., ¶ 37 & fn. 19.

[28] See id., ¶ 16, Exh. 4 & fn. 12 (including linked video).

[29] See id., ¶ 17 & Exh. 6 (owner of John Cedars channel revealing his face and identity on his YouTube page).

[30] See id., Exh. 9 (PACER Case Locater report reflecting no lawsuits brought against Lloyd Evans, creator of the Cedars Video).

[31] See id., ¶¶ 32-37 & Exh. 9.

[32] See id., ¶ 37 & fn. 19 (collecting cases).

failure to pursue enforcement action against known infringers (including YouTube user John Cedars, or the individuals identified in response to other DMCA Subpoenas) casts doubt on Watchtower's representation that the Subpoena at issue here was sought for solely purposes of "protecting Watch Tower's rights under title 17 U.S.C. §§ 100, *et seq.*"[33]

Movant published the User Video pseudonymously because, though he is no longer a practicing JW, he has not been formally excommunicated (a process JWs call "disfellowshipping"), and may therefore maintain ties with family and friends in the religion.[34] The JW religion regards publication of views critical of the church as a form of apostasy, and the customary punishment for apostasy is disfellowshipping.[35] Actively practicing JWs are required to shun and avoid disfellowshipped ex-JWs, upon penalty of losing their own privileges or status within the church.[36] If Movant were disfellowshipped, he would be permanently shunned by his friends and even his family members (exceptions are granted only for family members living under the same roof).[37] Disfellowshipping would effectively sever Movant's ties with his parents, and with many of his closest friends.[38] Lapsed JWs who have been disfellowshipped describe the process as traumatic.[39] Movant's reasonable fear of disfellowshipping drives his desire to remain anonymous in these proceedings.

---

[33] Doc. No. 1-2, p. 2, ¶ 4 (June 15, 2018 Declaration of Paul D. Polidoro).

[34] *See* Seymour Decl., ¶¶ 24-25 & Exh. 8.

[35] *See* id., ¶ 23 & Exh. 7.

[36] *See* id., ¶ 24 & Exh. 8.

[37] *See* id., ¶¶ 24, 28 & Exh. 8.

[38] *See* id., ¶ 28.

[39] *See* id., ¶ 27 & Exh. 7.

## ARGUMENT

I.  **The Subpoena Should be Quashed Because Watchtower Cannot State a Valid Claim of Copyright Infringement**

A motion to quash may be brought to limit or prevent a subpoena that would require disclosure of "privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). Where, as here, a subpoena requests identifying information for purposes of unmasking an anonymous speaker, it seeks matter potentially protected by the First Amendment.

> It is offensive – not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak . . . Three obvious examples illustrate the pernicious effect of such a permit requirement. First, as our cases involving distribution of unsigned handbills demonstrate, there are a significant number of persons who support causes anonymously. "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, *by concern about social ostracism*, or merely by a desire to preserve as much of one's privacy as possible."

*Stratton*, *supra*, 536 U.S. at 165-66 (invalidating ordinance on First Amendment grounds, among other reasons, because it required JW canvassers to identify themselves by name in a village registry) (*quoting McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995)). *See also*, *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964) (court order in civil proceeding, compelling production of certain information, was "state action" subject to strictures of First Amendment); *Sony Music Entertainment Inc. v. Does 1-40*, 326 F.Supp.2d 556, 562-63 (S.D.N.Y. 2004) ("The Supreme Court has recognized that the First Amendment protects anonymous speech. . . . anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. . . . It is well-settled that the First Amendment's protection extends to the Internet. . . . The Internet is a particularly effective forum for the dissemination of anonymous speech") (internal quotations and citations omitted).

Watchtower has itself offered an impassioned defense of the importance of anonymous speech, in its opening brief in the *Stratton* case:

> The justification for including anonymous discourse within the liberty protected by the free speech and free press clauses predates the formation of this country. The press licensing law of England, the persecution of those engaged in the secret distribution of information, and the importance of anonymous discourse by pre-Revolutionary patriots moved this Court to recognize that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind."

Br. for Pet'rs, 17, *Stratton*, No. 00-1737 (U.S. Nov. 29, 2001) (*quoting Talley v. California*, 362 U.S. 60, 64 (1960)).[40]

Accordingly, "[t]o the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010). And while, "anonymity . . . used to mask copyright infringement . . . is unprotected by the First Amendment" (*id.*), "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107. The factors relevant to determining whether quashal of a de-anonymizing subpoena is appropriate are:

> (1) [the] concrete[ness of the plaintiff's] showing of a prima facie claim of actionable harm, ... (2) [the] specificity of the discovery request, ... (3) the absence of alternative means to obtain the subpoenaed information, ... (4) [the] need for the subpoenaed information to advance the claim, ... and (5) the [objecting] party's expectation of privacy.

*Arista Records, LLC*, *supra*, 604 F.3d at 119 (*quoting Sony Music Entertainment Inc.*, *supra*, 326 F.Supp.2d at 564-65). A DMCA subpoena seeking identifying information of an alleged copyright infringer must therefore be quashed to preserve anonymity where the requesting party cannot make out a *prima facie* claim of copyright infringement.

---

[40] A copy of Watchtower's Petitioner's Brief in the *Stratton* case is annexed as Exhibit 10 to the <u>Seymour Aff.</u>

While fair use is nominally regarded as an affirmative defense, it has been distinguished from other affirmative defenses as an issue that may be appropriately determined on a Rule 12(b)(6) motion to dismiss, defeating an otherwise *prima facie* showing of infringement.  *See Hughes v. Benjamin*, 437 F.Supp.3d 382, 389 (S.D.N.Y. 2020) (defendant may defeat a *prima facie* showing of infringement by demonstrating fair use, and may do so on a motion to dismiss if the facts necessary to establish fair use are evident from materials "properly incorporated" by reference into the pleadings); *Harbus v. Manhattan Institute for Policy Research*, Case No. 19-CV-6124 (ER), 2020 WL 1990866 at *3 (S.D.N.Y. Apr. 27, 2020).  *See also Lenz v. Universal Music Group*, 815 F.3d 1145, 1152-53 (9th Cir. 2016) (because fair use is not infringement, "Even if . . . fair use is classified as an 'affirmative defense,' we hold—for the purposes of the DMCA—fair use is uniquely situated in copyright law so as to be treated differently than traditional affirmative defenses. We conclude that because 17 U.S.C. § 107 created a type of non-infringing use, fair use is 'authorized by the law' and a copyright holder must consider the existence of fair use before sending a takedown notification").  Where "the only two pieces of evidence needed to decide the question of fair use" are "the original version" and the allegedly infringing work, the issue of fair use may be resolved on a motion to dismiss.  *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013) (*quoting Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir.2012)).  *See also*, *Yang v. Mic Network, Inc.*, 405 F.Supp.3d 537, 542 (S.D.N.Y. 2019) (collecting cases holding that fair use can be determined by comparison of both works).[41]

Consistent with these principles, the Second Circuit and other courts have evaluated claims of fair use when adjudicating motions to quash DMCA identifying subpoenas.  *See, e.g. Arista*

---

[41] Movant has re-uploaded the User Video and the JW Video so that the Court's may review and compare the two works for purposes of deciding this Motion.  *See* Seymour Decl., fns. 6, 7; Exhs. 11, 12.

*Records, supra*, 604 F.3d at 123-24; *In re DMCA Subpoena to Reddit, Inc.*, 441 F.Supp.3d 875, 886-887 (N.D.Cal. 2020) (rejecting Watchtower's argument that fair use analysis was premature at motion to quash stage); *Art of Living Foundation v. Does 1-10*, Case No. 10-CV-5022 (LHK), 2011 WL 5444622, at *8, n. 6 (N.D.Cal. Nov. 9, 2011) ("As the fair use doctrine enshrines an important First Amendment protection, a court determining whether to unmask an anonymous defendant might consider fair use arguments raised in a motion to quash even where the applicable standard requires only a *prima facie* showing of the plaintiff's claim") (*citing Arista Records*, *supra*, 604 F.3d at 110).

### A. The User Video Makes Fair Use of the JW Video and Is Not Infringement

The Copyright Act sets forth a non-exhaustive list of factors to be considered in determining whether a work that reproduces copyrighted material makes fair use of the original:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. While Watchtower has made much of the fact that the User Video was published prior to the initial publication of the JW Video as evidence of Movant's "bad faith," courts

interpreting § 107 have stressed that a finding of bad faith "generally contributes little to fair use analysis . . . is not to be weighed very heavily . . . and cannot be made central to the fair use analysis." *NXIVM Corp. v. Ross Institute*, 364 F.3d 471, 479, n. 3 (2d Cir. 2004) (*citing Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585, n. 18 (1994)).

1.  *The User Video Makes Non-Commercial, Critical and Transformative Use of the JW Video*

The User Video is textbook example of transformative fair use under Second Circuit precedent, especially the closely analogous *NXIVM* decision, which warrants in-depth analysis. *NXIVM* concerned a claim of copyright infringement by a multi-level marketing organization in relation to a proprietary course manual that was "unpublished in the sense that it [was] not available to the general public." *NXIVM*, *supra*, 364 F.3d at 475.  The NXIVM manual was leaked by a NXIVM participant to defendant Rick Ross, an investigative journalist whose websites "provide[d] information to the public about controversial groups, about which complaints of mind control ha[d] been lodged."  *Id.*[42]  Ross provided a copy of the NXIVM manual to the two other defendants, each of whom drafted a report "analyz[ing] and critiqu[ing] the materials for the manual, . . . quot[ing] sections of the manual in support of their analyses and criticisms."  *Id.*

While acknowledging that the journalists' unauthorized use of the unpublished NXIVM manual "weigh[ed] in favor of plaintiffs," the Second Circuit ultimately concluded that the "critical and transformative" nature of the defendants' use minimized the importance of the manual's "bad faith" acquisition.  *Id.* at 478-489.  The *NXIVM* court distinguished the holding in *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985), finding that the misappropriation and

---

[42] Last year, following a high-profile jury trial, NXIVM founder Keith Raniere was convicted on counts of racketeering, forced labor, wire fraud and sex trafficking.  *See U.S. v. Raniere*, Case No. 18-CR-204 (S-2) (NGG), Doc. No. 735 (E.D.N.Y. June 20, 2019).  Ross' early reporting on the organization was instrumental in bringing concerns about the group's indoctrination practices to public attention.

publication of a "purloined manuscript" in that case was done with "the intended purpose of supplanting the copyright holder's commercially valuable right of first publication." *NXIVM*, *supra*, 364 F.3d at 478-79.  While NXIVM argued "that its first publication rights were similarly 'scoop[ed],'" the Second Circuit disagreed, holding that the purpose of transformative criticism, by definition, was not to supplant or replace the original. *Id.* at 479.

Just as in *NXIVM*, the first factor of the fair use inquiry favors the Movant.  Both the User Video and the JW Video are non-commercial in nature.  The User Video was available for free on the Movant's YouTube Account,[43] and the JW Video may be viewed, downloaded and shared free of charge from the JW website.[44]  Movant never monetized the User Video.[45]  The purpose of the User Video is to educate viewers about what Movant considers to be the shortcomings of the JW religion, through satire and direct criticism.[46]  The User Video so heavily edits and alters the original JW Video that it could not conceivably supplant or "scoop" the original – it is a fair and transformative use.

### 2. The JW Video is Informational and Non-Commercial in Nature

The second element of the fair use inquiry examines "the nature of the copyrighted work" by considering "the protection of the reasonable expectations of one who engages in the kinds of creation/authorship that the copyright seeks to encourage." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).  Generally speaking, creative or expressive works and commercial works are afforded greater copyright protection. *See Blanch v. Koons*, 467

---

[43] *See* <u>Seymour Decl.</u>, ¶ 11 & fn. 8.

[44] *See* <u>id.</u>, ¶ 18 & Exh. 3.

[45] *See* <u>id.</u>, ¶ 11 & fn. 8.

[46] *See* <u>id.</u>, ¶¶ 11, 22.

F.3d 244, 256 (2d Cir. 2006) (artistic and expressive works receive greater protection) (*quoting* Howard B. Abrams, The Law of Copyright, § 15:52 (2006)); *Yang*, *supra*, 405 F.Supp.3d at 545. The JW Video is religious, educational and informational in nature, which weighs slightly in favor of a finding of fair use – but it was also unpublished at the time of its use by Movant, which weighs slightly against a finding of fair use. *See id.*

However the Court may balance these opposing factors, the second prong of the fair use test is ultimately "of limited usefulness where the creative work of art is being used for a transformative purpose." *Bill Graham Archives*, *supra*, 448 F.3d at 613. This Court's decisions have minimized this element of the fair use test as "rarely determinative," and "of little import." *See Hughes*, *supra*, 437 F.Supp.3d at 393; *Harbus*, *supra*, 2020 WL 1990866 at *6.

### 3. The User Video Excerpts an Insubstantial Portion of the JW Video

The "amount and substantiality" factor of the fair use test weighs in Movant's favor. This factor looks to the percentage of the original work used in the new work, and not the percentage of the new work consisting of the original work. *NXIVM*, *supra*, 364 F.3d at 480 (*quoting* 17 U.S.C. § 103(3)). While there is no bright-line standard for substantiality, "[t]he crux of the inquiry is whether 'no more [content] was taken than necessary,' given the purpose and character of the allegedly infringing use." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014). Generally speaking, the more transformative the use, the greater the permissible amount. *See Campbell*, *supra*, 510 U.S. at 578 ("the more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use"); *Bill Graham Archives*, *supra*, 448 F.3d at 613 (copying of entire image may still be fair use depending on context); *Hughes*, *supra*, 437 F.Supp.3d at 392 (noting that "courts have found transformative uses even in cases involving exact copying").

Courts have found fair use where a new work used even more substantial portions of the original work than the User Video did of the JW Video. The User Video excerpts roughly 14% of the JW Video, which is not a substantial amount in light of its parodic intent and transformative use. *See Hughes*, *supra*, 437 F.Supp.3d at 393 (new video that copied 20 percent of original video for purposes of criticizing original was fair use); *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34, 46 (S.D.N.Y. 2017) (where intent of new work was to critique and parody original, new work's use of three minutes and fifteen seconds of video footage from five minute and twenty-four second original was fair). The User Video superimposes music, speech and text over much of the borrowed JW Video footage. *See Blanch*, *supra*, 467 F. 3d at 248, 257-58 (doctoring of original photograph decreased substantiality of use); *Harbus*, *supra*, 2020 WL 1990866 at *7 (heavy cropping and doctoring of photograph decreased substantiality of use); *Yang*, *supra*, 405 F.Supp.3d at 546-47 (cropping of photograph weighed in favor of defendant on fair use inquiry). And the User Video does not excerpt footage from the JW Video except to parody and criticize it. *See NXIVM*, *supra*, 364 F.3d at 481 (portion of original worked used was not excessive because all excerpted portions were relevant to defendants' analysis and critical commentary); *Hosseinzadeh*, *supra*, 276 F. Supp.3d at 46 (even where new video used 60 percent of footage from original, "a great deal of plaintiff's work was copied, but such copying was plainly necessary to the commentary and critique"). Applying the guidelines set forth by these cases, the third factor of the fair use case clearly favors the Movant.

4. *The User Video Is Not a Replacement for the JW Video and Does Not Impact the Non-Commercial "Market" for the JW Video*

The fourth and final prong of the fair use test, concerning "the effect of the secondary use upon the potential market for the value of the copyrighted work," roundly favors the Movant. *Cariou*, *supra*, 714 F.3d at 708.

> [T]he application of this factor does not focus principally on the question of damage to [the copyright owner's] derivative market. We have made clear that 'our concern is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use usurps the market of the original work.' . . . Our court has concluded that an accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original. . . . Conducting this analysis, we are mindful that "[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original," even though "the fair use, being transformative, might well harm, or even destroy, the market for the original."

*Id.* at 708-09 (*quoting Blanch, supra*, 467 F.3d at 258; *NXIVM, supra*, 364 F.3d at 481-82; *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998)) (internal citations omitted). "[A] lethal parody, like a scathing theater review, kills demand for the original, [but] does not produce a harm cognizable under the Copyright Act." *Campbell, supra*, 510 U.S. at 591-92.

Because the JW Video is not commercial in nature, it has no "market" to speak of. But even if the term "market" is interpreted liberally to mean "audience," the User Video so heavily alters, edits and satirizes the JW Video that it could not plausibly serve as a substitute for the original. The purpose served by the User Video is opposite that of the JW Video – the former promotes skepticism, while the latter promotes piety and worship. The two videos are not directed at the same audience, and while the User Video aims to reduce demand for the JW Video, it is by its nature incapable of usurping that demand.

Because three of the four statutory factors support a finding of fair use, two of them decisively so, Movant overcomes any *prima facie* showing of copyright infringement by Watchtower, warranting quashal of the Subpoena. *See Arista Records, supra*, 604 F.3d at 123-24 (court should evaluate claims of fair use in determining motion to quash DMCA identifying subpoena).

## II. The Subpoena Should Be Quashed Because Watchtower Has Misrepresented its Purpose

The availability of the DMCA subpoena mechanism is restricted to parties who seek information to enforce rights conferred by the Copyright Act. As such, a party requesting a DMCA subpoena must certify, as Watchtower has done in this case,[47] that "the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title." 17 U.S.C. § 512(h). The Court permitted issuance of the Subpoena at issue here in reliance on Watchtower's representation that it would only use Movant's name and identifying information for purposes of enforcing its copyright in the JW Video.

Three years have now passed since Watchtower started requesting DMCA subpoenas *en masse* to unmask dissidents, and in that time a factual record has developed that belies the representations made in Watchtower's statutory declaration. Of the 60 DMCA Subpoenas Watchtower has requested, not one has culminated in a claim of copyright infringement.[48] Perhaps more tellingly, Watchtower has not – upon information and belief – brought any infringement claim against the creator of the Cedars Video, even though Watchtower knows his name,[49] and his video reproduces the JW Video almost in full.[50] These facts had not come to light in 2018, when the Court permitted issuance of the Subpoena. But they are apparent now from a search of publicly available records.

---

[47] Doc. No. 1-2, p. 2, ¶ 4.

[48] *See* Seymour Decl., ¶¶ 32-37 & Exh. 9.

[49] *See* id., ¶ 17 & Exh. 9 (showing no copyright lawsuit by Watchtower against Lloyd Evans, creator of the Cedars Video).

[50] *See* id., ¶ 16 & fn. 12.

Watchtower should not be able to misuse the DMCA subpoena mechanism for the purpose of doxing and ostracizing its critics. The Court should not permit enforcement of the Subpoena absent an enhanced showing by Watchtower that (1) this is the true purpose for which the DMCA Subpoenas have been requested and (2) identifying information acquired by way of the DMCA Subpoenas has not been used for purposes of disfellowshipping alleged copyright infringers, whether by Watchtower or any other affiliated entity.[51]

## III. If the Subpoena Is Not Quashed, Movant Should Be Permitted to Appear Anonymously in Future Proceedings

Even if the Court does not wish to pass on the merits of Watchtower's underlying copyright claim, and allows the Subpoena to go forward, it should protect Movant's anonymity unless and until a claim of infringement has been proven. *See, e.g.*, *Malibu Media LLC v. Doe No. 4*, Case No. 12-CV-2950 (JPO), 104 U.S.P.Q. 1941, 2012 WL 5987854, at *4-5 (S.D.N.Y. Nov. 30, 2012) (granting leave to proceed anonymously even while permitting DMCA subpoena to issue). While Fed. R. Civ. P. 10(a) ordinarily requires that parties to a lawsuit be identified by name in the caption, the Second Circuit has outlined a balancing test to be applied where a litigant seeks an exception to this rule and leave to proceed anonymously:

> (1) whether the litigation involves matters that are highly sensitive and of a personal nature; (2) *whether identification poses a risk of retaliatory physical or mental harm to the ... party [seeking to proceed anonymously] or even more critically, to innocent non-parties*; (3) *whether identification presents other harms and the likely severity of those harms, including whether the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity*, (4) whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously, *whether the nature of that prejudice (if any) differs at any particular stage of the*

---

[51] Alternatively, if the Court permits the Subpoena to go forward, it should enter an injunction directing Watchtower and its affiliates to use such information only for the purpose of pursuing copyright claims against the Movant. *See, e.g.*, *Signature Management Team, LLC v. Automattic, Inc.*, 941 F.Supp.2d 1145, 1157, 1158-59 (N.D. Cal. 2013) (permitting issuance of DMCA subpoena, but prohibiting issuer from "disseminat[ing] [movant's] identity or tak[ing] any retaliatory action," and ordering that "information disclosed . . . in response to the subpoena may be used . . . solely for the purpose of protecting its rights under the Copyright Act . . . and may not be disclosed to anyone other than the parties in this action and their counsel of record without further order of this Court").

> *litigation, and whether any prejudice can be mitigated by the district court*; (5) whether the plaintiff's identity has thus far been kept confidential; and (6) whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity.

*Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) (internal quotations and citations omitted) (emphasis added).00

Relevant to the first three factors of the foregoing test, the accompanying Declaration details how Movant's identification in these proceedings would subject him to foreseeable mental harm in the form of his disfellowshipping.[52]  Movant would be cut off from any friend of his who remains a practicing JW, and from any relatives who do not live in his home, including his parents.[53]  This Court has held that mental harm of comparable severity warrants permission to proceed anonymously.  *See Doe v. Bedford Central School District, et al.*, Case No. 18-CV-11797 (VB), 2019 WL 493819, at *1 (S.D.N.Y. Feb. 8, 2019) (parents of adolescent who committed suicide were permitted to remain anonymous, so that their other children would not be harassed at school); *Malibu Media, LLC*, *supra*, 2012 WL 5987854, at *4 (individual accused of downloading pirated pornographic films permitted to remain anonymous to avoid reputational harm).  Movant has opposed both the Subpoena and the underlying copyright claim not because he seeks to republish the User Video, but because he wishes to enforce his First Amendment right to anonymity.  Permitting Movant to proceed anonymously would avoid the scenario in which the "injury litigated against" is incurred by virtue of the litigation itself.  *Sealed Plaintiff*, *supra*, 537 F.3d at 190.  Movant has maintained complete anonymity in these proceedings thus far;

---

[52] *See* Seymour Decl., ¶¶ 22-28.

[53] *See* id. ¶ 28.

accordingly, the first, second, third and fifth factors of the *Sealed Plaintiff* test all counsel in favor of granting leave to proceed anonymously.

Concerning the fourth factor of this test, Watchtower argues that it would be prejudiced by Movant's continued anonymity in these proceedings because "Watch Tower cannot send a cease and desist letter or issue service of process absent the individual's name."[54]  The Second Circuit has stressed that the weight afforded to this factor should be guided by "whether any prejudice can be mitigated by the district court."  *Id*.  If the Court concludes that Watchtower has a colorable claim of copyright infringement, it could fashion any number of equitable solutions that would preserve Movant's anonymity while negating any prejudice to Watchtower, including: granting Watchtower leave to serve process and/or any cease and desist letter on Movant through Movant's undersigned counsel;[55] permitting the Subpoena to go forward only to the extent of seeking Movant's IP address; and/or limiting disclosure of Movant's name and identifying information to outside counsel who have appeared on Watchtower's behalf in these proceedings, with such information to be handled on an attorneys' eyes only basis.  Because any prejudice to Watchtower could be avoided, this factor does not support denial of leave to proceed anonymously.

While the public may have a strong interest in the openness and transparency of judicial proceedings, this does not necessarily equate to a strong interest in disclosure of a civil litigant's personal identifying information.  *See, e.g.*, *Doe*, *supra*, 2019 WL 493819, at *1 (where lawsuit disclosed identities of relevant public officials and fully described incidents giving rise to litigation, "the public's interest in the litigation would not be furthered by also requiring [litigants'] identities to be disclosed," and "the public's interest in being informed about the subject matter of

---

[54] Doc. No. 7, p. 2.

[55] Movant has conditionally authorized his undersigned counsel to accept service of a cease and desist letter (1) if his Motion to quash is denied and (2) if his Motion for leave to proceed anonymously is granted.

the case has been met"); *Malibu Media, LLC*, *supra*, 2012 WL 5987854, at *5 (while public scrutiny of judicial proceedings is vital, public's interest in knowing the names of copyright defendants is of less importance). Because Movant does not aim to seal these proceedings but merely maintain the secrecy of his identity, the public's interest in judicial transparency is only minimally implicated by his request to proceed anonymously.

With four of six factors favoring Movant's continued anonymity, one factor presenting as neutral, and any potential prejudice to Watchtower capable of neutralization, Movant should be granted leave to proceed anonymously, even if the Court denies quashal.

## **CONCLUSION**

Wherefore, for the reasons set forth above, Movant respectfully requests that Watchtower's Subpoena be quashed or, in the alternative, that Movant be allowed to remain anonymous in this and any subsequent proceedings, and such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
      September 28, 2020

FOSTER GARVEY P.C.

By: /s/ Malcolm Seymour
    Malcolm Seymour (MS-3107)
    100 Wall Street, 20th Floor
    New York, New York 10005-3708
    (212) 965-4533
    malcolm.seymour@foster.com

    *Attorneys for Movant John Doe*

Eric J. Shimanoff (ejs@cll.com)
Thomas Kjellberg (txk@cll.com)
Kieran G. Doyle (kgd@cll.com)
COWAN, LIEBOWITZ & LATMAN, P.C.
114 West 47th Street
New York, NY 10036
(212) 790-9200

Paul D. Polidoro (ppolidor@jw.org)
Watch Tower Bible and Tract Society of Pennsylvania
100 Watchtower Drive
Patterson, NY 12563
(845) 306-1000

*Attorneys for Respondent Watch Tower Bible*
*and Tract Society of Pennsylvania*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No. 7:18-mc-00268 (NSR) |
| DMCA Section 512(h) Subpoena to | : | |
| YOUTUBE (GOOGLE, INC.) | : | |
| | : | |
| | : | |

------------------------------------------------------------- x

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO QUASH SUBPOENA AND TO PROCEED ANONYMOUSLY

Respondent Watch Tower Bible and Tract Society of Pennsylvania ("Watch Tower") respectfully submits this memorandum of law further in opposition to Movant John Doe's ("Doe") motion for an Order, pursuant to Fed. R. Civ. P. 45(d)(3), quashing the subpoena issued in this matter on June 20, 2018, or in the alternative granting Doe leave to proceed anonymously.

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

FACTS ......................................................................................................................................3

ARGUMENT ...........................................................................................................................8

I.     THE COURT SHOULD DENY DOE'S MOTION TO QUASH ......................................8

     A.     Doe's Motion to Quash Is Untimely ....................................................................8

     B.     The *Arista* Factors Mandate that the Court Sustain the Subpoena ........................9

              1.     WT Has Established a *Prima Facie* Claim of Copyright Infringement and Doe Has Failed to Establish Fair Use as a Matter of Law .......................................................................................10

              2.     The Subpoenaed Information Is Specific and Narrowly Tailored to Identify the Infringer .............................................17

              3.     WT Has No Alternative Means to Obtain the Subpoenaed Information .............................................................................17

              4.     WT Needs the Subpoenaed Information to Advance Its Copyright Claim ...............................................................18

              5.     Doe Has No Expectation of Privacy on YouTube ....................................18

              6.     *In re DMCA Subpoena to Reddit, Inc.* Is <u>Not</u> Relevant ............................18

     C.     WT Issued the Subpoena to Protect Its Copyrights ............................................19

II.     THE COURT SHOULD DENY DOE'S MOTION TO PROCEED ANONYMOUSLY ..........................................................................................22

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994)........................................................................................11

*Anonymous v. Simon*,
2014 U.S. Dist. LEXIS 27563 (S.D.N.Y. Mar. 3, 2014)...................................22, 23

*Arista Records, LLC v. Doe*,
604 F.3d 110 (2d Cir. 2010)........................................................................9, 10, 17, 18

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)........................................................................................11

*Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*,
2013 U.S. Dist. LEXIS 48513 (S.D.N.Y. Mar. 29, 2013) .......................................12

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994).................................................10, 11, 13, 14, 15, 16, 17

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013).......................................................................................14

*Chi. Bd. of Educ. v. Substance, Inc.*,
354 F.3d 624 (7th Cir. 2003) .....................................................................................17

*Coleman v. HBO, Inc.*,
2019 U.S. Dist. LEXIS 230656 (E.D.N.Y. Aug. 6, 2019)......................................11

*In re DMCA Subpoena to Reddit, Inc.*,
441 F. Supp. 3d 875 (N.D. Cal. 2020) ..............................................................18, 19

*Doe v. Skyline Autos., Inc.*,
375 F. Supp. 3d 401 (S.D.N.Y. 2019)........................................................................24

*Doe v. Weinstein*,
2020 U.S. Dist. LEXIS 161497 (S.D.N.Y. Sep. 3, 2020)........................................23

*Everson v. Board of Education*,
330 U.S. 1 (1947)........................................................................................................21

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018).......................................................................................10

ii

*Graham v. Prince*,
   265 F. Supp. 3d 366 (S.D.N.Y. 2017) .................................................................................11

*H. M. Kolbe Co. v. Armgus Textile Co.*,
   315 F.2d 70 (2d Cir. 1963) ...............................................................................................19

*Harbus v. Manhattan Inst. for Policy Research, Inc.*,
   2020 U.S. Dist. LEXIS 74568 (S.D.N.Y. Apr. 27, 2020) ......................................................13

*Harper & Row, Publrs. v. Nation Enters.*,
   471 U.S. 539 (1985) .....................................................................................13, 14, 15, 16

*Hirsch v. CBS Broad. Inc.*,
   2017 U.S. Dist. LEXIS 123468 (S.D.N.Y. Aug. 4, 2017) ...............................................11, 14

*Hirsch v. Complex Media, Inc.*,
   2018 U.S. Dist. LEXIS 209701 (S.D.N.Y. Dec. 10, 2018) ....................................................14

*Infinity Broad. Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) .............................................................................................15

*John Wiley & Sons, Inc. v. Doe Nos. 1–30*,
   284 F.R.D. 185 (S.D.N.Y. 2012) .................................................................................9, 17, 18

*LaChapelle v. Fenty*,
   812 F. Supp. 2d 434 (S.D.N.Y. 2011) .................................................................................12

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*,
   179 F.3d 1244 (9th Cir. 1998) ..........................................................................................21

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986) ...........................................................................................13

*N. Jersey Media Grp., Inc. v. Doe*,
   2012 U.S. Dist. LEXIS 167317 (S.D.N.Y. Nov. 26, 2012) ....................................................24

*Nova Biomedical Corp. v. i-STAT Corp.*,
   182 F.R.D. 419 (S.D.N.Y. 1998) .........................................................................................9

*Paul v. Watchtower Bible & Tract Soc.*,
   819 F.2d 875 (9th Cir. 1987) ............................................................................................23

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987) ...............................................................................................17

*Sealed Plaintiff v. Sealed Defendant*,
   537 F.3d 185 (2d Cir. 2008) .............................................................................................22

31653/000/3574339

*Sony Music Entertainment Inc. v. Does 1-40*,
  326 F. Supp. 2d 556 (S.D.N.Y. 2004).................................................................................18

*Southside Fair Housing Committee v. New York*,
  928 F.2d 1336 (2d Cir. 1991)...........................................................................................22

*Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014)...............................................................................................10

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016).............................................................................................13

*United States v. Gillette*,
  383 F.2d 843 (2d Cir. 1967).............................................................................................21

*United States v. Int'l Bus. Machines Corp.*,
  70 F.R.D. 700 (S.D.N.Y. 1976) ........................................................................................21

*United States v. Pilcher*,
  950 F.3d 39 (2d Cir. 2020)...............................................................................................23

*Watch Tower Bible and Tract Society of Pennsylvania v. The Truth and
  Transparency Foundation, et al.*,
  No. 20 Civ. 3366 (S.D.N.Y.) (Vyskocil, J.)..............................................................19, 20

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*,
  536 U.S. 150 (2002)..........................................................................................................10

*Wright v. Warner Books, Inc.*,
  953 F.2d 731 (2d Cir. 1991)..............................................................................................15

**Statutes**

Digital Millennium Copyright Act ("DMCA"), 15 U.S.C. § 512............................................ *supra*

31653/000/3574339

## PRELIMINARY STATEMENT

The Court should not grant Doe the extraordinary relief of quashing a subpoena and proceeding anonymously. Not only has Doe mispresented key facts to the Court—including how and from whom he obtained leaked copies of Watch Tower's videos—but there are other disputed issues of material fact—including concerning the commercial nature of his infringing video, the amount of material Doe took from Watch Tower, Doe's purported commentary in the infringing video, the creativity underlying Watch Tower's videos and Doe's unfounded claims of disfellowshiping and doxing. The Court cannot determine the highly fact sensitive issue of fair use as a matter of law or diverge from the normal practice of proceeding without anonymity at this premature juncture without discovery and before a complaint even has been filed.

Doe's representation that he obtained the Watch Tower videos from another YouTube video is demonstrably false. Portions of the Watch Tower videos that appear in Doe's video do not appear in that third-party video, making Doe's assertion an impossibility. This disparity creates significant issues of fact—including as to whether Doe was actively involved in the unlawful exfiltration of the Watch Tower videos—shows a clear need for discovery without the shield of anonymity to test Doe's credibility and vitiates any claim Doe has for equitable relief.

Doe also misleads the Court about the commercial nature of his infringing video. Doe specifically solicited financial contributions for his video and even provided his PayPal account information therefor. Doe regularly monetizes his other videos, including through Google Ads, seeking direct contributions and promoting and linking to his and third-party t-shirt businesses.

Doe similarly attempts to minimize the amount of the Watch Tower videos that appear in his infringing video, failing to acknowledge that he took material from four original works (not just one work), including 90% of the visual aspects of a highly creative music video. Doe also fails to acknowledge that more than half of his video was comprised of Watch Tower content.

1

While Doe claims his video is a fair use criticism of Jehovah's Witnesses, the actual commentary appears to be more along the lines of simply "watch this," belying his claims of fair use. Doe also makes a concerted effort to boast how he unlawfully obtained the Watch Tower videos "early" as they were "leaked" to him by a "good friend deep inside Bethel," and that he gets "to enjoy July's broadcast" "before the rank and file get to see it." Doe's commentary appears to be more about mocking copyright law and the right of first publication, and touting how his copy was unauthorized, more than about any actual criticism of the constitutionally protected religious practices of Jehovah's Witnesses. Doe similarly makes a bald statement that the underlying Watch Tower videos are merely information and religious in nature, ignoring that one is a music video and that each contains significant creative content and choices.

Finally, Doe's claims of potential doxing and disfellowshiping are baseless. Watch Tower has never publicly disclosed the identity of any infringer revealed in response to a DMCA subpoena. And no person whose identity was obtained through a DMCA subpoena has been subject to doxing or disfellowshiping by Watch Tower. Doe has not provided one example to the contrary. His own allegations—inadmissible hearsay asserted by Doe's counsel without personal knowledge—admit that his concerns of doxing and disfellowshiping are based on mere conjecture. That Watch Tower has not yet filed a copyright litigation against the subject of a subpoena is not indicative of any ill motives. As Judge Siebel recently held in connection with a motion to quash another subpoena, Watch Tower has valid and reasonable explanations for not pursuing more litigations—including its limited enforcement budget; the lack of useful information provided in response to many of these other subpoenas; the potential lack of jurisdiction over certain infringers; and Watch Tower's own ability to resolve matters without the need for judicial intervention, including through settlement.

31653/000/3574339

## FACTS

Watch Tower ("WT") is a non-profit corporation that is responsible for the creation, publication and protection of original works of authorship—including books, magazines, music, visual art and videos—that support the work of Jehovah's Witnesses.  Much of the original content created by WT is published and distributed pursuant to license by third party Watch Tower Bible and Tract Society of New York, including via the website at www.jw.org (the "JW Website").  Declaration of Paul D. Polidoro ("Polidoro Decl.") ¶¶ 3-4 & Ex. A.

Between August 2017 and January 2018, WT created the following four original audio-visual works, each of which is registered with the U.S. Copyright Office:

| Title | Current Location on the JW Website | Copyright Registration No. | Registration Date |
|---|---|---|---|
| Never Alone | https://www.jw.org/en/library/music-songs/original-songs/never-alone/?content=video | PA0002131662 | 8/3/2018 |
| Allan Boyle: Deep Study for a Clearer Picture | https://www.jw.org/en/library/videos/#en/mediaitems/VODIntExpArchives/pub-jwb_201807_4_VIDEO | PA0002131659 | 8/3/2018 |
| Keep a Tight Grip—Through Effective Personal Study | https://www.jw.org/en/library/videos/#en/mediaitems/VODBiblePrinciples/pub-jwb_201807_6_VIDEO | PA0002131853 | 8/3/2018 |
| Mark Noumair: Keep "a Tight Grip on the Word of Life" | https://www.jw.org/en/library/videos/#en/mediaitems/StudioTalks/pub-jwb_201807_2_VIDEO | PA0002131665 | 8/3/2018 |

(the "Original WT Videos").  *Id.* ¶ 4 & Ex. B.  The Original WT Videos also were published and registered with the Copyright Office (PA0002132168) as a compilation with additional material (with the Original WT Videos, the "WT Videos").  *Id.* ¶ 6 & Ex. C.  Although the subject matter of the WT Videos is derived from the bible and the teachings of Jehovah's Witnesses, the videos are creative, expressive and non-factual works; indeed, one is a music video with musical and actor performances, costumes, sets, lighting and sound design.  The other videos similarly

3

contain significant expressive language and design and production choices.  *Id.* ¶¶ 7-9.

WT intended that it would, and in fact did, itself first publish the WT Videos via the JW Website in July 2018.  WT had taken precautions to protect the WT Videos from premature public disclosure, including by: (1) restricting access to and creating authorization levels within the software used to produce the videos; (2) requiring production team members to sign confidentiality agreements; and (3) limiting and vetting through WT's computer department security team and management any non-WT storage or distribution system used in production.  Despite these measures, several months before WT was able to exercise its right of first publication, and before all of the videos were finalized, unbeknownst to WT, Doe somehow obtained copies of the WT Videos without WT's consent.  *Id.* ¶¶ 10-12.

On May 18, 2018, Doe posted a video entitled "DUBTOWN – Family Worship July Broadcast" (the "Doe Video") on the video platform YouTube, which is owned by Google, Inc. ("Google").  The Doe Video reproduced significant portions—both quantitatively and qualitatively—of the WT Videos, including approximately 90% of the visual aspects and more than 50% of the audio aspect of the Never Alone music video and also copied the "heart" and significantly creative aspects of the other videos.  The portions of the WT Videos copied in the Doe Video generally are unaccompanied by criticism or comment beyond the equivalent of "watch this."  The characters in the Doe Video state that the WT Videos were "leaked" to them by a "good friend deep inside Bethel," and that they "get to enjoy July's broadcast" "before the rank and file get to see it."  Doe's "comments" on the Never Alone music video amount mostly to: (1) ridiculing the presence of a blank green screen in some of the segments, even though it was clear the video was not complete before Doe unlawfully obtained a copy thereof; and (2) juxtaposing other sound recordings (presumably without permission from those copyright

4

owners) over certain segments of the video.  Content from the WT Videos comprised over half of the Doe Video.  *Id.* ¶¶ 13-18.

WT did not grant authorization to Doe to obtain prior to publication, to reproduce, to broadcast or to use in any manner the WT Videos.  Doe boasted on his YouTube page that he obtained the WT Videos "early," clearly mocking WT's first publication right and copyright law. Although Doe claims he only reproduced without authorization content from ***one*** video created by WT, he actually reproduced content from at least ***four*** videos.  *Id.* ¶¶ 19-21 & Ex. D.

On his YouTube page, Doe solicited financial contributions in connection with the Doe Video: "for those who have asked about supporting my work, my paypal account is kevinmcfree@gmail.com."  Doe apparently solicits "donations" for each video he posts on YouTube.  Many of these same videos are monetized through Google Ads. In one of Doe's videos, he touts the monetization of his other videos about Jehovah's Witnesses through paid Google advertisements, thanks those who have sent him "donations," requests additional "donations" and promotes his new for-profit t-shirt business that ties into his videos.   In connection with several YouTube videos, Doe also promotes and provides direct links to a third-party for-profit design service and t-shirt store.  *Id.* ¶¶ 22-26 & Exs. D-G.

Shortly after WT first learned about the Doe Video, on June 6, 2018, WT sent a copyright infringement take down notice to Google pursuant to the Digital Millennium Copyright Act ("DMCA"), demanding removal of the Doe Video from YouTube.  In the notice, WT alleged that the Doe Video infringed WT's copyrights in the WT Videos, as well as in two works of art owned by WT.  In response to WT's take down notice and in accord with the procedures set forth in the DMCA, YouTube removed the Doe Video from its platform.  *Id.* ¶¶ 27-29 & Ex. H.

In addition to take down procedures, the DMCA also allows copyright owners to obtain

5

from the Court a subpoena to an ISP (internet service provider) seeking "information sufficient to identify the alleged infringer."  17 U.S.C. § 512(g).  Upon WT's application, on June 20, 2018, the Clerk of the Court issued to Google a subpoena seeking the name, address, telephone number, email address and IP (internet protocol) address associated with the Doe Video (the "Subpoena").  WT served the Subpoena on Google on July 6, 2018.  Google's deadline to respond to the Subpoena was July 15, 2018.  Polidoro Decl. ¶ 30-32 & Exs. H-J.

On August 22, 2018, Doe identified himself as the author and publisher of the Doe Video and filed a letter with the Court requesting a pre-motion conference on his proposed motion to quash the Subpoena (Dkt.#6).  On August 27, 2020, the Court set a briefing schedule for the motion to quash without the need for a pre-motion conference (Dkt.#11).

Doe avers he obtained all portions of the WT Videos that he reproduced in the Doe Video from a third-party video posted on YouTube on April 4, 2018 by "John Cedars" aka Lloyd Evans (the "Cedars Video").  Seymour Decl. ¶ 13. However, *this claim is demonstrably false*.  Certain portions of the WT Videos that were replicated in the Doe Video (time stamps 1:58-2:10 and 5:39-5:49 in the Doe Video) *do not appear in the Cedars Video*.  Polidoro Decl. ¶ 39.

Doe also claims that WT has not sent YouTube a demand to take down the Cedars Video (or was unsuccessful in such actions).  Seymour Decl. ¶¶ 16-17. Setting aside that a third party's potential copyright violation does not justify Doe's own actions, WT was unaware of the Cedars Video until Doe served his moving papers on September 28, 2020.  Doe did not disclose the title, account name or URL associated with the Cedars Video in his August 22, 2018 pre-motion letter to the Court (Dkt.#6), or at any time during the two years thereafter.  Moreover, when WT had become aware of infringing content posted by Mr. Evans in the past, it sent DMCA take down notices to the hosting ISPs and a demand letter directly to Mr. Evans.  Polidoro Decl. ¶¶ 40-43.

WT's copyright enforcement efforts are supported by voluntary donations. Because of its limited resources, WT takes reasonable, cost-efficient and calculated efforts to protect its copyrighted content, typically by: (1) securing federal copyright registrations (over 3,300 to date); (2) posting copyright notices on its content and the JW Website; (3) posting terms of use on the JW Website that users may not "[p]ost artwork, electronic publications, trademarks, music, photos, videos, or articles from this website on the Internet (any website, file-sharing site, video-sharing site, or social network)"; (4) sending cease and desist letters; (5) speaking directly with infringers; and (6) serving DMCA subpoenas seeking identifying information about infringers. *Id.* ¶¶ 44-52 & Ex. K.

As WT has increased its digital distribution of its works, including via the JW Website, it has seen an escalation in instances of infringement. To deal with these increasing copyright violations, in or about 2018, WT expanded its legal team and resources dedicated to enforcing its copyrights. During this time, WT has obtained and served approximately sixty DMCA subpoenas and began assessing potential litigations. Unfortunately, the responses to many of these subpoenas did not reveal information that would help identify the name or address of the infringer. For example, many responses revealed IP addresses and VPNs (virtual private networks) not associated with any one individual. Responses to other subpoenas indicated that infringers were located outside the jurisdiction of the U.S. courts. *Id.* ¶¶ 53-58.

With respect to the subpoenas that did elicit identifying information, given WT's limited enforcement budget and non-profit status, it approaches litigation cautiously and needs to make the actions it takes count. In an attempt to avoid litigation, many of these matters were resolved without the need for judicial intervention, including through written or oral communications with the infringer (including those located outside the U.S.). And, unlike here, where Doe continued

7

to use other WT copyrighted material in his videos well after the Subpoena was issued, several of these matters involved infringers who had stopped their infringing activities.  *Id*. ¶¶ 59-62.

WT has never publicly disclosed the identity of the subject of a WT DMCA subpoena. No person whose identity was obtained through a WT DMCA subpoena has been subject to doxing by WT.  No information obtained through a WT DMCA subpoena has been used to disfellowship the subject of that subpoena.  Some subjects of WT DMCA subpoenas were active Jehovah's Witnesses before they became the subject of a subpoena and remained active Jehovah's Witnesses after WT received identifying information about them.  *Id*. ¶¶ 63-67.

Doe will not lose any purported right to express his views of Jehovah's Witnesses if the Court sustains the subpoena or denies his motion to proceed anonymously.  Myriad third parties have posted commentary on Jehovah's Witnesses via various media without any hindrance of their rights of free speech.  Indeed, Mr. Evans, whom Doe references several times in his moving papers, does not hide his name or identity in his YouTube videos that express negative opinions about Jehovah's Witnesses.  To the contrary, he appears personally in nearly all his video and prominently touts his real name "Lloyd Evans" on his YouTube page and as the author of two books he has written about himself and Jehovah's Witnesses.  *Id*. ¶¶ 68-69 & Ex. L.

## ARGUMENT

## I.    THE COURT SHOULD DENY DOE'S MOTION TO QUASH

### A.    Doe's Motion to Quash Is Untimely

Doe's August 22, 2018 pre-motion conference letter (Dkt.#6) acknowledged that his anticipated motion to quash was ***untimely*** as the letter was ***filed over a month after the Subpoena's responsive deadline***.  Doe further represented in his pre-motion letter that his motion would include a request to extend the time to move to quash "on grounds of excusable neglect."  The Court's August 27, 2020 Order dispensing with the need for a pre-motion

conference and setting a briefing schedule (Dkt.#11) did not make any explicit ruling on whether Doe's motion to quash was timely.  Nor did Doe move to extend the deadline to move to quash in his motion papers or make any arguments therein concerning excusable neglect.  WT maintains its objection that the instant motion is untimely.  *See Nova Biomedical Corp. v. i-STAT Corp.*, 182 F.R.D. 419, 422 (S.D.N.Y. 1998) ("timely motion" under Rule 45 must be made prior to return date).  By failing to move to extend the time to move to quash under Rule 6 in his motion papers, Doe has waived the right to argue the deadline should be extended.  The Court should deny Doe's motion on this basis alone.

### B.    The *Arista* Factors Mandate that the Court Sustain the Subpoena

"The owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work."  *Arista Records, LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106).  While "the First Amendment provides protection for anonymous speech . . . [it] does not . . . provide a license for copyright infringement.  *Id*. at 119.  "Thus, to the extent that anonymity is used to mask copyright infringement or to facilitate such infringement by other persons, it is unprotected by the First Amendment."  *Id*.  In determining whether to quash a subpoena seeking the identity of an anonymous infringer, courts consider:

> (1) [the] concrete[ness of the plaintiff's] showing of a *prima facie* claim of actionable harm, . . . (2) [the] specificity of the discovery request, . . . (3) the absence of alternative means to obtain the subpoenaed information, . . . (4) [the] need for the subpoenaed information to advance the claim, . . . and (5) the [objecting] party's expectation of privacy.

*Id*. (alterations in original).  Doe bears the burden of showing that the Court should quash a subpoena.  *See John Wiley & Sons, Inc. v. Doe Nos. 1–30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012).

Examination of each of the *Arista* factors compels the Court to deny Doe's motion to quash.[1]

> **1.  WT Has Established a *Prima Facie* Claim of Copyright Infringement and Doe Has Failed to Establish Fair Use as a Matter of Law**

The elements of copyright infringement are: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Id.* at 117.[2] Doe does not dispute that WT is the owner of the copyrights in  and that he copied portions of the WT Videos without permission. Doe instead argues that his copying of the WT Videos constitutes "fair use."

> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. "[T]he . . . factors [may not] be treated in isolation . . . . All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994). "Fair use is an affirmative defense, so [Doe] bears the burden of proving it," *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018). "[W]hatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving" party. *Id.* at 187 n.38.

Because "fair use is a mixed question of fact and law," *Swatch Grp. Mgmt. Servs. v.*

---

[1] Doe's reference to *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002)—a case in which WT was not a party—is nothing more than a red herring that has no relevance here. The issue in *Stratton* was whether a person had to disclose their identity and obtain a permit before exercising their right to speech and religious practice. Here, not only has Doe already spoken, but he has unlawfully copied and leaked WT's copyrighted materials in connection with such speech in violation of the Copyright Act. The First Amendment is not a defense to copyright infringement. *Arista Records*, 604 F.3d at 119.

[2] Watch Tower's registration certificates create a presumption of the validity and originality of the copyrights in the Watch Tower Works. 17 U.S.C. § 410(c).

*Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014), its "application . . . always depends on consideration of the precise facts at hand." *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 916 (2d Cir. 1994). The fair use inquiry "often requires close questions of judgment as to the extent of permissible borrowing," *Campbell*, 510 U.S. at 579 n.10, and the "task [of applying the fair use doctrine] is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Id*. at 577-578. Evaluating whether a particular use qualifies as fair use requires the Court to engage in "an open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

"[D]ue to the fact-sensitive nature of the inquiry, courts generally do not address the fair use defense until the summary judgment phase." *Graham v. Prince*, 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017). While the Second Circuit has acknowledged the ***theoretical*** possibility "of fair use being so clearly established by a complaint as to support dismissal of an copyright infringement claim, there is a dearth of cases granting a motion to dismiss on the basis of fair use." *Id*. (citation omitted). Court similarly are skeptical about granting summary judgment on fair use. *See Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) ("the fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area").

Courts in this Circuit consistently decline to address fair use on such a factually deficient record as the one before the Court. *See*, *e.g.*, *Hirsch v. CBS Broad. Inc.*, 2017 U.S. Dist. LEXIS 123468, at *21-22 (S.D.N.Y. Aug. 4, 2017) ("the pleadings and cognizable materials—limited to the Complaint, the Photo and the Episode—do not contain enough factual content to enable a solid assessment [on fair use]"); *Coleman v. HBO, Inc.*, 2019 U.S. Dist. LEXIS 230656, at *16-17 (E.D.N.Y. Aug. 6, 2019) ("Further development of the record is needed to clarify where

11

Defendants obtained Plaintiff's work and to identify the intended purpose behind the Film's use of the Work"); *Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, 2013 U.S. Dist. LEXIS 48513, at *29 (S.D.N.Y. Mar. 29, 2013) ("The Court cannot address the fact-intensive issue of fair use after reviewing only the pleadings [and] before the Parties have completed discovery").

Despite this precedent, Doe asks this Court to determine on a motion to quash an ultimate issue in a yet to be filed litigation, where no complaint has been drafted, without any formal discovery and where key facts, including how Doe obtained the videos and whether the videos are used for commercial purposes, are either disputed, undeveloped or unknown. The minimal and disputed fact record in this matter clearly "is insufficient to make such a fact-intensive ruling as a matter of law." *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 448 (S.D.N.Y. 2011).

<u>Factor One</u>

The first fair use factor considers the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." Doe's bald assertion "that the [Doe] Video was not sold for commercial use or monetized for ad revenue," Seymour Decl. ¶11, is neither accurate nor sufficient to establish that Movant's use was "non-commercial in nature." Doe's YouTube page on which the Doe Video appeared specifically elicited—and provided PayPal account information for—***financial contributions*** to Doe and his video endeavors. The page also promoted and provided a link to a third-party for-profit design business and t-shirt store. Doe also makes similar requests for "donations" in connection with his other videos posted on YouTube and has promoted his own and a third-party for-profit t-shirt business in connection with his videos. Many of Doe's videos are monetized by Google Ads and Doe has created a specific video touting Google Ads and soliciting contributions to his videos.

Whether a use is "commercial" is not a binary determination; the "commercial nature of

the use is a matter of degree, not an absolute." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986). And as the Supreme Court has held, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985). Precisely where Doe's use of the WT Videos falls on the commercial-nonprofit spectrum cannot reliably be determined on this premature motion and without discovery.

Another mandatory consideration under the first fair use factor is "the propriety of the defendant's conduct." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (noting that "fair use presupposes 'good faith' and 'fair dealing,'" and rejecting fair use defense where defendant "knowingly exploited a purloined manuscript."). "Because fair use is an affirmative defense, it is the defendant's burden to show that it did not act in bad faith. On a motion to dismiss on the basis of fair use, absence of bad faith must therefore be evident on the face of the pleadings." *Harbus v. Manhattan Inst. for Policy Research, Inc.*, 2020 U.S. Dist. LEXIS 74568, at *13 (S.D.N.Y. Apr. 27, 2020). That is clearly not the case here, where not only has Doe knowingly exploited a stolen copy of unpublished videos, he has misrepresented to the Court how and from whom he obtained that copy. The *Harper & Row* Court, presented with similarly culpable conduct on the part of the defendant publisher, "assume[d] defendants' bad faith and weigh[ed] this subfactor in favor of plaintiffs." *Harper & Row*, 471 U.S. at 562.

Another essential aspect of the first factor analysis is whether the use is "transformative"; i.e., whether the new work "merely supersedes the objects" of the original or "instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579; *see TCA Television Corp. v.*

13

*McCollum*, 839 F.3d 168, 178 (2d Cir. 2016). Does' claim that his use of the WT Videos was transformative is anything but "self-evidently correct." *Hirsch v. CBS Broad., Inc.*, 2017 U.S. Dist. LEXIS 123468 *19 (S.D.N.Y. August 4, 2017). Indeed, the portions of the WT Videos copied in the Doe Video generally are unaccompanied by criticism or comment beyond the equivalent of "watch this." Doe's "comments" on the Never Alone music video amount mostly to: (1) ridiculing the presence of a blank green screen in some of the segments, even though it was clear the video was not yet complete; and (2) juxtaposing other sound recordings (presumably without permission from those copyright owners) over certain segments of the video. "Further development of the record is necessary to clarify what, if any, new insights and understandings were created" by Doe's unauthorized use of the WT Videos. *Hirsch v. Complex Media, Inc.*, 2018 U.S. Dist. LEXIS 209701, at *17 (S.D.N.Y. Dec. 10, 2018).

*Factor Two*

In evaluating the second factor, courts "consider (1) whether the work is expressive or creative, . . . with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Cariou v. Prince*, 714 F.3d 694, 709-10 (2d Cir. 2013) (citations and quotation marks omitted).

Here, the second factor weighs against fair use on both counts. Doe's assertion that the WT Videos are "religious, educational and informational in nature" misunderstands the inquiry under the second fair use factor and misrepresents the nature of the WT Videos, motion pictures that "fall within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586. To the extent, if any, that the WT Videos are "informational," their expressive qualities overwhelm their factual aspects for the purposes of the second factor. *See Harper & Row*, 471 U.S. at 563

14

("within the field of fact works, there are gradations as to the relative proportion of fact and fancy. One may move from sparsely embellished maps and directories to elegantly written biography"). Indeed, one of the works is a music video and the other works contain significant creative choices. And there can be no dispute that the WT Videos were unpublished when Doe unlawfully obtained them and used them without permission, and that Doe has unclean hands where he misrepresented to the Court where and how he obtained them.

*Factor Three*

The third fair use factor, the amount and substantiality of the portion used, "recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair, and that even a less substantial taking may be unfair if it captures the essence of the copyrighted work." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998). The quantitative assessment examines the portion of the copyrighted work that was taken in relation to the whole of that work, while the qualitative assessment considers the importance of the expressive components of the portion copied. *See Campbell*, 510 U.S. at 587. Doe's contention that the third factor "looks to the percentage of the original work used in the new work, and not the percentage of the new work consisting of the original work" is thus incomplete—and wrong to boot. The fair use factors "are not meant to be exclusive," *Harper & Row*, 471 U.S. at 560; and, as *Campbell* explains, under the third factor

> whether a substantial portion of the infringing work was copied verbatim from the copyrighted work is a relevant question, for it may reveal a dearth of transformative character or purpose under the first factor, or a greater likelihood of market harm under the fourth.

510 U.S. at 587-88. *See also Wright*, 953 F.2d at 739 (fair use should consider "the amount and substantiality of the protected passages in relation to the work accused of infringement").

The Doe Video reproduced significant portions—both quantitatively and qualitatively—

15

of the WT Videos, including approximately 90% of the visual aspects and more than 50% of the audio aspect of the Never Alone music video and also copied the "heart" and significantly creative aspects of the other videos.  Doe's calculations proffered in his moving papers improperly analyze the WT Videos as one single work, when in fact they were four works, from each of which Doe took substantial amounts.  And more than half of the Doe Video was comprised of the WT Videos.  Whether the "quantity and value of the materials used" without permission by Doe "are reasonable in relation to the purpose of the copying," *Campbell*, 510 U.S. at 586, cannot be conclusively determined without further development of the record.

### *Factor Four*

The fourth factor requires courts to consider not only the extent of harm to the market for, or value of, the copyrighted work "caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590.  The fourth-factor inquiry also "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568.

"Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."  *Campbell*, 510 U.S. at 590.  Doe has placed no such evidence on the record; only the simplistic assertion, *ipse dixit*, that "[b]ecause the [WT] Video is not commercial in nature, it has no 'market' to speak of."  Doe's one-dimensional approach to the fourth factor would clearly be an insufficient basis for the Court to assess the fourth factor even if it were supported by evidence.

Even if Doe were to prove that "Watchtower does not make 'commercial use' of the [WT] Video, and there is no commercial market for the [WT] Video," it would not help Doe on

16

the fourth factor. Diminution of market value in copyrighted works "is not lessened by the fact that their author has disavowed the intention to publish them during his lifetime . . . . He is entitled to protect his **opportunity** to sell his letters." *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (emphasis in original). And the fourth factor asks the Court to consider the effect of the use not only on the "potential market" for the copyrighted work, but on the "value" of the work. *See*, *e.g.*, *Chi. Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 630 (7th Cir. 2003).

In *Campbell*, given the defendants' failure to submit evidence of harm to the potential market for or value of the work, instead "confin[ing] themselves to uncontroverted submissions that there was no likely effect on the market for the original," the Supreme Court found that "it is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment." 510 U.S. 569 at 590. The absence from the record of evidence with respect to the fourth factor similarly disentitles Doe to a favorable ruling on Doe's fair use defense.

### 2. The Subpoenaed Information Is Specific and Narrowly Tailored to Identify the Infringer

The Subpoena seeks information that is narrowly tailored to provide the identity and contact information for the infringer Doe, namely, his name, physical address, email address, telephone number and IP address. Such a limited request strongly favors sustaining the Subpoena under the second *Arista* factor. *See John Wiley & Sons, Inc. v. Doe*, 284 F.R.D. 185, 189-91 (S.D.N.Y. 2012).

### 3. WT Has No Alternative Means to Obtain the Subpoenaed Information

Doe does not identify himself on his YouTube page and has gone through great lengths to mask his true identity from WT and the public. Google will not provide the information about Doe's identity without a subpoena. WT thus cannot determine the identity and contact

17

information for Doe without obtaining such information by the Subpoena.  Polidoro Decl. ¶¶ 35-37.  The third *Arista* factor thus weighs strongly in favor of WT.  *See id*. at 189-91.

### 4.    WT Needs the Subpoenaed Information to Advance Its Copyright Claim

Absent the subpoenaed information, WT will not be able to evaluate the appropriateness of a federal litigation, including if the Court has personal jurisdiction over Doe, or serve process on Doe.  These facts strongly weigh in favor of sustaining the Subpoena.  *See Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 566 (S.D.N.Y. 2004).

### 5.    Doe Has No Expectation of Privacy on YouTube

Subscribers of ISPs such as YouTube have only "a minimal expectation of privacy in the transmission or distribution of copyrighted material."  *John Wiley & Sons*, 284 F.R.D. at 191.  Google's terms of use specifically state: "Content you submit must not include third-party intellectual property (such as copyrighted material) unless you have permission," *see* https://www.youtube.com/static?template=terms, and "We will share personal information [to m]eet any applicable . . . legal process."  *See* https://policies.google.com/privacy.  Doe thus had no reasonable expectation that Google would not disclose his identity when it received the Subpoena.  *See Sony Music*, 326 F. Supp. 2d at 566-67 (no expectation of privacy where terms of service that prohibit copyright infringement and authorize disclosure of identity).  Thus, the final *Arista* factor weighs heavily in favor of sustaining the Subpoena.

### 6.    *In re DMCA Subpoena to Reddit, Inc.* Is <u>Not</u> Relevant

Doe's reliance on *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875 (N.D. Cal. 2020), where the Court quashed WT's DMCA subpoena to an ISP, is misplaced.  First, the Court in *Reddit* did not analyze the motion under the Second Circuit's *Arista* test; there is no discussion of four out of the five *Arista* factors.  Second, the relevant fair use facts *Reddit* were different

18

than those known here.  For example, the Court in *Reddit* found the works at issue were "factual works—instructions on how to donate online and a summary of potentially applicable European data laws," and thus were entitled to a narrow scope of protection.  441 F. Supp. 3d at 885.  Here, the WT Works are creative, audio-visual works—including a music video—which weighs against a finding of fair use.  Similarly, the Court in *Reddit* found that the movant "did not help himself to an oversized portion of WT's works *vis-à-vis* his critical message."  *Id*.  Here, Doe took significant portions of the WT Videos, including 90% of the visual aspects of a music video.  Finally, in *Reddit*, the Court found the facts were undisputed.  441 F. Supp. 3d at 8.  Here, the facts are significantly disputed, including concerning how Doe obtained the WT Videos, the nature and characteristics of the Doe Video and WT's videos, Doe's potential commercial purpose in posting the video and Doe's unsupported allegations about disfellowshiping.

### C.   WT Issued the Subpoena to Protect Its Copyrights

Doe asks the Court to quash the Subpoena for the additional reason that WT purportedly seeks to use the information provided in response to the Subpoena not to protect its copyrights, but for the purposes of doxing Doe.  In support thereof, Doe claims that WT has obtained approximately sixty DMCA subpoenas but has not filed a lawsuit relating to any of those matters.  But this is not evidence of any hidden purpose, let alone that WT desires to dox Doe.

Setting aside that a copyright owner is under no obligation to file suit or take any action against any or all infringers, *see H. M. Kolbe Co. v. Armgus Textile Co.*, 315 F.2d 70, 74 (2d Cir. 1963), WT has legitimate reasons for not filing suit in those other matters.  WT is a non-profit corporation and has a limited budget to engage in expensive litigation; it must be selective and cost-conscious and get the most "bang for its buck," including precedential value.[3]    The

---

[3] Indeed, earlier this year WT filed a copyright infringement action (*Watch Tower Bible and Tract Society of Pennsylvania v. The Truth and Transparency Foundation, et al.*, No. 20 Civ. 3366

responses to most of those subpoenas revealed information that would not help identify the name or address of the infringer or indicated the infringer was beyond the jurisdiction of the United States judicial system. WT was able to resolve several of the matters after identifying information was disclosed by pre-litigation discussions and correspondence with the infringer. And, unlike Doe, several of the parties were not repeat infringers.

Accepting these explanations as legitimate and reasonable, in *Watch Tower Bible and Tract Society of Pennsylvania*, No. 20 Misc. 119 (S.D.N.Y.), Hon. Judge Seibel recently denied a motion to quash where the movant made arguments nearly identical to those made here by Doe:

> Movant challenges the good faith of Watchtower's representation that its purpose in seeking a DMCA subpoena is solely to identify a potential defendant for a copyright infringement action, alleging that Watchtower has invoked the [DMCA] 59 times without ever then bringing such a lawsuit. ***The Court can imagine reasons for that fact (if it is a fact) that do not evidence lack of good faith*** . . . .
>
> Having heard further from the parties, I deny the motion to quash. ***Watch Tower has provided an explanation for why it has not pursued more cases*** . . . .

Polidoro Decl. ¶ 74 & Ex. M (emphasis added).

Moreover, Doe's doxing concerns are unfounded, speculative and not supported by admissible evidence. No person whose identity was obtained through a DMCA subpoena has been subject to doxing by WT. No information obtained through use of a DMCA subpoena has been used to disfellowship the subject of a DMCA subpoena. Some of the subjects of WT's DMCA subpoenas were active Jehovah's Witnesses before they became the subject of a DMCA subpoena and remained active Jehovah's Witnesses after WT received subpoena responses.

Notably, Doe fails to submit a declaration (even anonymously or under a pseudonym)

---

(S.D.N.Y.) (Vyskocil, J.)) against defendants that had unlawfully reproduced ***seventy-four*** of Watch Tower's videos. Polidoro Decl. ¶ 75 & Ex. N. Before answering, the defendants entered into a consent judgment and permanent injunction enjoining them from further use of the videos or any of WT's copyrighted works. *Id.*

attesting to his purported fears of disfellowshiping. All allegations concerning Doe have been submitted through the declaration of his counsel. Not only do these allegations constitute hearsay, but Doe's counsel admittedly lacks personal knowledge thereof. The Court should disregard Doe's unfounded claims of disfellowshiping for these reasons alone. *See United States v. Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967) (rejecting statement submitted by attorney without first hand knowledge of facts).

Even if the Court accepted the declaration of Doe's counsel, Does has failed to establish that disfellowshiping is a likely outcome of the disclosure of Doe's identity. Doe's counsel spends much time explaining what disfellowshiping is (mostly through unsupported statements and a hearsay third party new article) ***but provides no evidence that disfellowshiping is likely to occur here***. Not only has Doe failed to cite one instance of doxing or disfellowshiping as a result of an ISP complying with a WT DMCA subpoena, but his counsel admits that Doe's fears are speculative and based on nothing more than Doe's subjective "belief." Seymour Decl. ¶ 26. *See also id*. ¶ 19 (merely hypothesizing that "disclosure ***could*** expose [Doe] to retaliation). Such speculation is insufficient on its own to warrant that the Court quash the Subpoena. *See United States v. Int'l Bus. Machines Corp.*, 70 F.R.D. 700, 702 (S.D.N.Y. 1976).

Moreover, even if Doe's concerns had any basis in fact, courts "must be careful not to deprive religious organizations of all recourse to the protections of civil law that are available to others." *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1998). Indeed, "[s]uch a deprivation would raise . . . serious problems under the Free Exercise Clause." *Id*. Accordingly, WT is entitled to the same rights afforded to secular organizations under the DMCA, and it cannot be disadvantaged in the enforcement of its copyrights simply because it is a corporation that supports a religious entity. *See Everson v.*

21

*Board of Education*, 330 U.S. 1, 16 (1947) ("[W]e must be careful . . . to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious beliefs"); *Southside Fair Housing Committee v. New York*, 928 F.2d 1336, 1348 (2d Cir. 1991) (prohibiting Hasidic religious organizations from buying lands "would be suspect as a possible violation of the free exercise clause of the first amendment").

## II.   THE COURT SHOULD DENY DOE'S MOTION TO PROCEED ANONYMOUSLY

Doe's alternative request for leave to proceed under a pseudonym should also be denied. As a general rule, parties may not proceed anonymously. Fed. R. Civ. P. 10(a). This rule 'serves the vital purpose of facilitating public scrutiny of judicial proceedings . . . [it] cannot be set aside lightly." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 188-89 (2d Cir. 2008). Simply put, "[t]he people have a right to know who is using their courts." *Id.*

In order to proceed anonymously, a party must show that his "interest in anonymity" outweighs "both the public interest in disclosure and any prejudice to the defendant." *Anonymous v. Simon*, 2014 U.S. Dist. LEXIS 27563, at *3 (S.D.N.Y. Mar. 3, 2014). The Second Circuit has identified "non-exhaustive" factors to consider when ruling on a motion to proceed anonymously, including: whether the litigation involves matters that are highly sensitive and of a personal nature; whether identification poses a risk of retaliatory physical or mental harm; and whether the plaintiff is prejudiced by allowing the defendant to press its claims anonymously. *See Sealed Plaintiff*, 537 F.3d 189-90. The Court is not required to "use any particular formulation" provided that it "balance[s] the interests at stake." *Id.* at 191 n.4.

First, unlike the typical case in which a party seeks to protect a legitimate privacy interest, the litigation here does not involve matters that are highly sensitive and of a personal nature. Rather, it is only because Doe ***chose*** to make an infringing copy of the WT Videos and

22

*to post the Doe Video online* that there is any dispute here in the first place. Having voluntarily chosen to make his actions a matter of public inquiry, he cannot now hide his infringement behind the cloak of "highly sensitive" and "personal" matters, *Simon*, 2014 U.S. Dist. LEXIS 27563, at *5, especially in light of his agreement with YouTube that the ISP would disclose his identity in response to a valid subpoena based on copyright infringement.

Doe has also failed to present any tangible evidence that disclosure of his identity will result in retaliatory harm to him. As demonstrated above, his claims of doxing and disfellowshipping are "unsubstantiated speculation" contradicted by the facts. *United States v. Pilcher*, 950 F.3d 39, 43 (2d Cir. 2020). Nor is fear of disfellowshipping—essentially a "social stigmatization"—a valid basis upon which to proceed anonymously. *See Doe v. Weinstein*, 2020 U.S. Dist. LEXIS 161497, at *8 (S.D.N.Y. Sep. 3, 2020).

More to point, the Court is constitutionally prohibited from making any determination as to the propriety of the Jehovah Witnesses' practice of disfellowshipping, which is not a legally cognizable "harm," but rather a protected exercise of the First Amendment's free exercise clause. *See Paul v. Watchtower Bible & Tract Soc.*, 819 F.2d 875, 883 (9th Cir. 1987) ("Jehovah's Witnesses' practice of shunning is protected under the first amendment of the United States Constitution"). As the Ninth Circuit explained in *Paul*, when "members of the Church . . . conclude[] that they no longer want to associate with [someone] . . . [w]e hold that they are free to make that choice." *Id*. "Churches are afforded great latitude when they impose discipline on members or former members . . . . [R]eligious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be." *Id*. Thus, even if Doe could establish that disfellowshipping was a likely consequence of disclosing his identity, the First Amendment prevents this Court from becoming entangled in a religious inquiry in order to

23

"protect" Doe from what the Jehovah Witnesses believe is a loving application of their religion.

Doe's unsubstantiated and unprotectable claims of injury are easily outweighed by the prejudice that will be caused WT if Doe's identity remains hidden. WT needs the information for legitimate enforcement purposes, including policing against repeat infringers, identifying the source of leaks of its unpublished works and securing its own site from unauthorized encroachments. Polidoro Decl. ¶ 13. As noted above, Doe's claim that he obtained the WT Videos from Cedars is demonstrably false. To the extent Doe was in fact involved in taking WT's copyrighted material before it was published, while lying about where he got it and touting its "early" disclosure, he is ill situated to seek equitable relief from this Court in protecting his identity due to his unclean hands. Nor should he be heard to complain when WT seeks to take appropriate steps to remedy the wrong by preventing future unauthorized leaks of its materials.

More broadly, WT is prejudiced in its ability to prosecute a case of copyright infringement. Its ability to develop necessary jurisdictional facts and potential material to impeach Doe's credibility is substantially hampered if it cannot confront Doe in a meaningful way during the discovery process. *N. Jersey Media Grp., Inc. v. Doe*, 2012 U.S. Dist. LEXIS 167317, at *21-23 (S.D.N.Y. Nov. 26, 2012) (impairment in discovery using a pseudonym "would be significant" and "[s]ignificant prejudice will also attend the plaintiff in the later stages of the proceeding, including the trial, when fact-finding will depend, among other things, on the credibility of the witnesses, and the defendant's use of a pseudonym would not mitigate that prejudice"). And to the extent WT may seek to avoid the burdens and expenses of litigation through an amicable resolution, its inability to have direct contact with Doe severely hampers the likely progress of any potential settlement discussions. *Doe v. Skyline Autos., Inc.*, 375 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (internal quotation marks omitted) ("Allowing Plaintiff to proceed

anonymously would disadvantage Defendants at all stages of litigation, including settlement, discovery, and trial. Plaintiff's anonymity would make it more difficult to obtain witnesses and witness testimony, Defendants would have less leverage in settlement negotiations, and Defendants would not be able to fully and adequately cross-examine the Plaintiff").

Doe should be required to proceed in the regular way contemplated by the rules where he has failed to make any showing of harm, has already misled the Court as to the true state of facts and poses a continuing threat to WT's ability to enforce its intellectual property rights.

## **CONCLUSION**

Based on the foregoing, the Court should deny Doe's motion to quash and to proceed anonymously.

Dated: New York, New York       COWAN, LIEBOWITZ & LATMAN, P.C.
      October 27, 2020       By:    s/ Eric J. Shimanoff
      Eric J. Shimanoff (ejs@cll.com)
      Thomas Kjellberg (txk@cll.com)
      Kieran G. Doyle (kgd@cll.com)
      COWAN, LIEBOWITZ & LATMAN, P.C.
      114 West 47th Street
      New York, NY 10036
      (212) 790-9200

      Paul D. Polidoro (ppolidor@jw.org)
      Watch Tower Bible and Tract
      Society of Pennsylvania
      100 Watchtower Drive
      Patterson, NY 12563
      (845) 306-1000

      *Attorneys for Respondent Watch*
      *Tower Bible and Tract Society of*
      *Pennsylvania*

31653/000/3574339

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DMCA Section 512(h) Subpoena to
YOUTUBE (GOOGLE, INC.)

Case No. 7:18-mc-00268 (NSR)

# REPLY MEMORANDUM OF LAW
# IN SUPPORT OF MOTION TO QUASH
# <u>AND TO PROCEED ANONYMOUSLY</u>

Dated:  Brooklyn, New York
        November 10, 2020

**FOSTER GARVEY P.C.**

By:  Malcolm Seymour (MS-3107)
100 Wall Street, 20th Floor
New York, New York 10005-3708
(212) 965-4533
malcolm.seymour@foster.com

*Attorneys for Movant John Doe*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................ i

INTRODUCTION ................................................................................1

ARGUMENT ...................................................................................3

   I.   The Court May and Should Decide Fair Use as a Threshold Issue ....................................3

   II.   Drawing All Reasonable Inference in Watchtower's Favor, Movant Still Prevails on His Defense of Fair Use .............................................................5

      A.  The User Video Was Not Monetized, Which Carries Little Weight Anyway..............5

      B.  Movant Has Been Forthcoming About the Source of the JW Video Footage, Which Is Not Dispositive of Fair Use ..........................................................6

      C.  Watchtower's After-the-Fact Registration of Four Copyrights for One Video Should Not Be Considered for Purposes of Measuring Substantiality of Use .............8

   III.  In the Alternative, the Court Should Grant Continued Leave to Proceed Anonymously.....................................................................9

CONCLUSION.................................................................................10

FG:11324147.1

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Arista Records, LLC v. Doe 3* ......................................................................................3, 5
604 F.3d 110 (2d Cir. 2010)

*Brownmark Films, LLC v. Comedy Partners* ........................................................1, 4, 5
682 F.3d 687 (7th Cir. 2012)

*Campbell v. Acuff-Rose Music, Inc.* ...............................................................................6
510 U.S. 569 (1994)

*Cariou v. Prince* ......................................................................................................1, 4, 8
714 F.3d 694 (2d Cir.2013)

*Castle Rock Entertainment v. Carol Publishing Group, Inc.* ........................................6
150 F.3d 132 (2d Cir. 1998)

*Graham v. Prince* ..........................................................................................................3
265 F.Supp.3d 366 (S.D.N.Y. 2017)

*Harbus v. Manhattan Institute for Policy Research* .....................................................4
Case No. 19-CV-6124 (ER), 2020 WL 1990866 (S.D.N.Y. Apr. 27, 2020)

*Hosseinzadeh v. Klein* .................................................................................................4, 8
276 F.Supp.3d 34 (S.D.N.Y. 2017)

*Hughes v. Benjamin* ....................................................................................................4, 6
437 F.Supp.3d 382 (S.D.N.Y. 2020)

*NXIVM Corp. v. Ross Institute* ...................................................................................7, 8
364 F.3d 471 (2d Cir. 2004)

*Schwartzwald v. Oath Inc.* ...........................................................................................3
Case No. 19-CV-9938 (RA), 2020 WL 5441291 (S.D.N.Y. Sept. 10, 2020)

*Sealed Plaintiff v. Sealed Defendant* ............................................................................9
537 F.3d 185 (2d Cir. 2008)

*Sony Music Entertainment v. Does 1-40* ..................................................................5, 10
326 F.Supp.2d 556 (S.D.N.Y. 2004)

*TCA Television Corp. v. McCollum* ...............................................................................6
839 F.3d 168 (2d Cir. 2016)

FG:11324147.1

*Yang v. Mic Network, Inc.*............................................................................................................4, 5
405 F.Supp.3d 537, 548 (S.D.N.Y. 2019)

**Court Documents**

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton* ................................10
No. 00-1737 (U.S. Nov. 29, 2001)

**Rules, Statutes, Treatises, Misc., Etc.**

17 U.S.C. § 107 ................................................................................................................................6

## INTRODUCTION

Movant John Doe respectfully submits this reply memorandum in further support of his motion ("Motion") to quash the subpoena ("Subpoena") issued herein and proceed anonymously.[1]

The relevant facts are largely set forth in the initial moving papers.[2] Watchtower's opposition pokes holes in some of these facts, but the disputes raised by its papers relate to collateral issues that fall by the wayside where, as here, the secondary use is "transformative as a matter of law." *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir.2013). The Court need only "take a fleeting glance" at the User Video and the JW Video to see that they are radically different works, and that the User Video mocks the JW Video for its substance, "low artistic sophistication and quality -- in other words, fair use." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 689 (7th Cir. 2012). Watchtower does not dispute the authenticity of the User Video and JW Video furnished to the Court. As such, the Court has the facts it needs to render a decision. Even if all inferences are drawn in Watchtower's favor on the collateral disputes raised by its opposition, the Court need only view the works side by side to conclude that the User Video makes transformative use of the JW Video. The Motion should be granted and the Subpoena should be quashed.

---

[1] Watchtower argues that the Motion should be denied because it does not repeat Movant's initial request for an extension of time in which to submit his Motion. Undersigned counsel interpreted the Court's August 27, 2020 (Dkt. No. 11) Memorandum Endorsement, authorizing this Motion, as implicitly granting this relief. If this interpretation was in error, counsel relies on the facts set forth in his August 22, 2018 letter to the Court (Dkt. No. 6, pp. 2-3) as justification for Movant's minimal delay in bringing the Motion. Watchtower argues that the Court should ignore Movant's constitutional arguments because (1) YouTube notified Movant just five days before the Subpoena's return date that the Subpoena had issued and (2) it took Movant, a *pro se* foreign national, five weeks to locate pro bono counsel and submit a pre-motion letter. Watchtower had not filed a motion to compel within that five-week span and was not aggressively pursuing enforcement. The absence of prejudice to Watchtower is even clearer now than it was two years ago. Once the Court had set a briefing schedule for this Motion, Watchtower requested two additional weeks to submit opposition papers, and agreed to a one-week extension for Movant's reply. Dkt. No. 15. Meanwhile, the User Video has been removed from YouTube since 2018 and remains offline. Watchtower's transparent attempt to suppress Movant's First Amendment claims on a technicality, without any consideration of these equities or its own delays, is beneath an organization of its stature.

[2] To address and resolve certain factual disputes raised in Watchtower's opposition papers, the Movant himself has subscribed an additional Reply Declaration of John Doe in Support of Motion to Quash Subpoena and Proceed Anonymously ("Doe Decl."). Capitalized terms not defined herein have the same meaning defined in Movant's Memorandum of Law in Support of Motion to Quash and Proceed Anonymously (the "Initial Brief") and the Declaration of Malcolm Seymour in Support of Motion to Quash and Proceed Anonymously (the "Seymour Decl.").

Watchtower inflates these factual disputes to postpone the Court's consideration of fair use until summary judgment, or later. Watchtower supports its position with dated case law, ignoring the recent trend in this Court and others to "dispose of . . . copyright infringement action[s] based on the fair use affirmative defense while avoiding the burdens of discovery and trial." *Id.* This trend is especially salient here, where enforcement of a de-anonymizing Subpoena would inflict First Amendment harm if Movant's use is indeed fair. In these circumstances, justice delayed is justice denied, and there is constitutional urgency to decide fair use as a threshold matter.

While Watchtower urges the Court to defer determination of Movant's fair use defense, its endgame is unclear. Watchtower claims it operates on donations and prefers to resolve copyright disputes efficiently without litigation.[3] But it has not responded to Movant's offer to receive a cease-and-desist letter through his undersigned counsel.[4] Watchtower claims it has not pursued enforcement action in other cases because some alleged infringers "were located outside the jurisdiction of the U.S. courts."[5] But Movant's videos show that he lives in the United Kingdom,[6] and Watchtower still seems intent on plunging the parties into costly cross-border litigation. This litigation could be avoided if the Court adjudicated fair use here and now, but Watchtower struggles mightily to resist this obviously efficient result. Inconsistencies like these do nothing to ease Movant's concerns about Watchtower's objectives in pursuing this Subpoena.

Movant's excerption of the JW Video was fair use and, consequently, protected speech. Movant has a right to make that speech anonymously. The defense of this right is one of the reasons the Second Circuit and other courts have adjudicated fair use before enforcing DMCA

---

[3] *See* Declaration of Paul D. Polidoro in Opposition to Motion to Quash Subpoena and Proceed Anonymously ("Polidoro Decl."), pp. 6-7, ¶¶ 45-52.
[4] *See* Initial Brief, p. 20, n. 55.
[5] *See* Polidoro Decl., p. 7, ¶ 58.
[6] A fact that Movant has confirmed. *See* Doe Decl., p. 3, ¶ 10.

identification subpoenas. This Court can determine from the underlying works that the User Video is of a different purpose and character than the JW Video. The JW Video promotes worship. The User Video promotes skepticism. Watchtower's claim that Movant's "commentary appears to be more along the lines of simply 'watch this,'"[7] is remarkably tone deaf. It is rare that more than a few seconds pass without Movant mocking or criticizing the JW Video. No reasonable viewer could conclude that the User Video "usurps the market" for the original. It is transformative as a matter of law, and the Court should deny enforcement of the Subpoena. Additional discovery would not shed meaningful light on the Court's analysis, as the same result would obtain even if every factual dispute suggested by the opposition were resolved in Watchtower's favor.

Wherefore, and for the reasons set forth below, Movant respectfully requests that the Court quash the Subpoena or, in the alternative, grant Movant leave to proceed anonymously.

## **ARGUMENT**

### I. The Court May and Should Decide Fair Use as a Threshold Issue

The parties do not dispute that this case is controlled by *Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010), which considered and decided a defense of fair use before denying a motion to quash a DMCA subpoena. *Id.* at 123-24. Watchtower admits the law permits dismissal based on a defense of fair use, but contends that this possibility is merely "theoretical," and that courts do not in fact dismiss on such grounds.[8] This argument is flawed in three respects:

First and most pointedly, it is no longer true. The opposition cites *Graham v. Prince*, 265 F.Supp.3d 366 (S.D.N.Y. 2017) for the proposition that "there is a dearth of cases granting a motion to dismiss on the basis of fair use." *Id* at 377. Whatever the accuracy of that description in 2017, it is a misstatement of the law as it stands today. *See Schwartzwald v. Oath Inc.*, Case

---

[7] Memo of Law in Opposition to Motion to Quash Subpoena and to Proceed Anonymously ("WT Memo."), p. 2.
[8] WT Memo., p. 11.

FG:11324147.1

No. 19-CV-9938 (RA), 2020 WL 5441291, at *3 (S.D.N.Y. Sept. 10, 2020) (dismissing infringement claim on 12(b)(6) motion by comparing photographs); *Hughes v. Benjamin*, 437 F.Supp.3d 382, 394 (S.D.N.Y. 2020) (same, comparing videos); *Harbus v. Manhattan Institute for Policy Research,* Case No. 19-CV-6124 (ER), 2020 WL 1990866 at *9 (S.D.N.Y. Apr. 27, 2020); *Yang v. Mic Network, Inc.*, 405 F.Supp.3d 537, 548 (S.D.N.Y. 2019).

Second, even in 2017, this statement was only procedurally accurate, as courts had often determined fair use "as a matter of law," based solely on a comparison of underlying works. *See Cariou*, *supra*, 714 F.3d at 707-08 (fair use determined as a matter of law by "looking at the artworks and the photographs side-by-side"); *Hosseinzadeh v. Klein*, 276 F.Supp.3d 34, 40, 45 (S.D.N.Y. 2017) (dismissing infringement claim because "[t]he Court's review of the . . . videos makes it clear" that defendants' video was fair use). The trend toward deciding fair use at the pre-discovery stage is a reaction to the old and wasteful practice of taking discovery, only to later adjudicate fair use based on underlying works alone. The Seventh Circuit's decision in *Brownmark*, which affirmed a district court's pre-answer dismissal on fair use grounds by converting the motion to dismiss into one nominally for summary judgment, is illustrative:

> This is a case about how a court may dispose of a copyright infringement action based on the fair use affirmative defense while avoiding the burdens of discovery and trial. . . . This video is a parody. . . [that] recreates a large portion of the original version, using the same angles, framing, dance moves and visual elements. . . . The district court concluded that "[o]ne only needs to take a fleeting glance at the South Park episode" to determine that its use of [plaintiff's] video is meant "to lampoon . . . low artistic sophistication and quality"—in other words, fair use. . . . [T]he district court required only the two videos to adjudicate this issue, especially in light of [plaintiff's] failure to make any concrete contention that the South Park episode reduced the financial returns from the original WWITB video.

*Brownmark*, *supra*, 682 F.3d at 689, 692.

Third, Watchtower's legal authorities are not wholly apposite to this case. Movant raises fair use as a defense to a Subpoena which, if wrongly enforced, would inflict constitutional harm.

-4-

"Against the backdrop of First Amendment protection for anonymous speech, courts have held that civil subpoenas seeking information regarding anonymous individuals raise First Amendment concerns." *Sony Music Entertainment v. Does 1-40*, 326 F.Supp.2d 556, 563 (S.D.N.Y. 2004). In each of the cases cited by Watchtower, the defendant's identity was already known, and no risk of constitutional injury was present. Here, a refusal to decide fair use before enforcing the Subpoena would moot this case by denying Movant the very right he seeks to vindicate: anonymous speech.

In *Arista*, the Second Circuit denied the infringers' motion to quash <u>only after</u> finding that piracy of copyrighted songs through file-sharing services was not fair use. *See Arista*, 604 F.3d at 124 (applying fair use factors and rejecting defense on the merits). *Arista* confronted and decided this issue at the threshold, due to of the constitutional repercussions of delaying adjudication. Especially because it "only needs to take a fleeting glance" at the underlying works to determine that the User Video is fair use, this Court should do the same. *Brownmark*, *supra*, 682 F.3d at 689.

II.   Drawing All Reasonable Inference in Watchtower's Favor, Movant Still Prevails on His Defense of Fair Use

Watchtower devotes much of its opposition to challenging Movant's characterization of collateral factual issues. Not all of these disputes are genuine, but even if they were, and each such dispute were resolved in Watchtower's favor, Movant's defense of fair use would still succeed. *See Yang*, *supra*, 405 F.Supp.3d 548 ("drawing all reasonable inferences in Plaintiff's favor, it is evident . . . that Defendant's use was fair as a matter of law").

   A.   **The User Video Was Not Monetized, Which Carries Little Weight Anyway**

Watchtower submits screenshots from Movant's present-day YouTube channel to challenge his claim that he did not monetize the User Video.[9] Movant has acknowledged that he

---

[9] *See* <u>Polidoro Decl.</u>, ¶ 26, Exh. G.

currently monetizes his channel, and has only stated that he did not monetize the User Video.[10]
The screenshots shown do not represent Movant's YouTube monetization during the brief window
in 2018 when the User Video was available.  From February 21 through June 19, 2018, Movant
was unable to monetize his YouTube channel because he did not meet viewership requirements.[11]

It is hardly clear that screenshots from two years after the fact are probative enough of any
question to raise genuine issues of fact.  But even if they are, the Court could resolve those
questions in Watchtower's favor and still find fair use.  The "commercial" nature of a secondary
work is of vanishing significance where the new work makes transformative use of the original:

> Congress identified "criticism, comment, news reporting, teaching, scholarship,
> and research" as illustrative purposes of a fair use. . . . [B]ecause nearly all of the
> illustrative uses listed . . . are generally conducted for profit in this country, . . .
> courts "do not give much weight to the fact that the secondary use was for
> commercial gain." . . . Instead, the critical question when applying the first fair use
> factor is whether the new work is "transformative."

*Hughes*, *supra*, 437 F.Supp.3d at 390 (*quoting* 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music,
Inc.*, 510 U.S. 569, 584 (1994); *TCA Television Corp. v. McCollum*, 839 F.3d 168, 180 (2d Cir.
2016); *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 150 F.3d 132, 142 (2d Cir.
1998)) (other internal citations omitted).  The dispute over monetization is thus a red herring.

### B.   Movant Has Been Forthcoming About the Source of the JW Video Footage, Which Is Not Dispositive of Fair Use

Watchtower emphasizes inaccuracies in Movant's description of how he acquired the JW
Video, and Movant has clarified these facts in his accompanying declaration.[12]  The initial Motion
papers stated that Movant obtained this footage from the Cedars Video, which Movant did not
correct because he believed it to be essentially true.[13]  It is more precise to say that Movant

---

[10] *See* <u>Seymour Decl.</u>, p. 3, n. 8.
[11] *See* <u>Doe Decl.</u>, pp. 2-3, ¶ 8.
[12] *See* <u>Doe Decl.</u>, pp. 1-2, ¶¶ 4-6.
[13] *See* <u>id.</u>

obtained high resolution footage from a member of the John Cedars team, shortly before with the release of the Cedars Video – a detail that Movant did not think significant, because he believed that the footage he had received was wholly contained within the Cedars Video.  Movant denies that he "misrepresented to the Court how and from whom he obtained" the JW Video.[14]  In fact, his pre-motion letter correctly stated that he "obtained the allegedly infringing footage through another YouTube user . . . who leaked the JW Video prior to its official release."[15]

Watchtower will argue that these inconsistencies raise questions about the provenance of the footage reproduced in the User Video.  But Watchtower does not connect to dots to explain how these peccadillos might defeat a finding of fair use.  Watchtower suggests they relate to "the propriety of [Movant's] conduct," but Watchtower already claims Movant acted in bad faith by using the JW Video prior to official publication – an undisputed fact about which Movant has been completely candid.[16]  Watchtower does not explain how Movant's acquisition of the JW Video in some other undiscovered way could sway the fair use calculus, especially in light of the leading authority on this issue, *NXIVM Corp. v. Ross Institute*, 364 F.3d 471 (2d Cir. 2004).  The opposition does not mention, much less distinguish *NXIVM*, and its avoidance of this case is telling.

In *NXIVM*, the defendants obtained copies of an unpublished manual from a leak inside the organization, violating non-disclosure agreements.   While acknowledging that the defendants' backdoor acquisition of the manual was in bad faith, the Second Circuit concluded that the ends of investigative journalism justified these means.  "[T]he bad faith of a defendant is not dispositive of a fair use defense. . . . [W]hile the subfactor pertaining to defendants' good or bad faith must be weighed, . . . we find that the first factor still favors defendants in light of the transformative nature

---

[14] WT Memo., p. 13.
[15] Dkt. No. 6, p. 2.
[16] *See* id.; Seymour Decl., pp. 2-3, ¶¶ 9, 13.

of the secondary use as criticism." *Id.* at 479. The opposition is altogether silent on *NXIVM*. Even if Watchtower took discovery on the issue of acquisition, it has not explained how the facts it might discover would command a different result in light of *NXIVM*'s safe harbor for transformative, critical use of leaked materials. Watchtower has cited no post-*NXIVM* authority, and Movant is aware of none, that rejected a fair use defense because of "bad faith" after a comparison of the underlying works revealed use that was "transformative as a matter of law." *Cariou*, *supra*, 714 F.3d at 707. The two works are so different that it cannot be plausibly argued the User Video usurped the market for the JW Video or "scooped" Watchtower's right of first publication. The source of the footage thus carries little weight and should not prevent a decision in Movant's favor.

### C. Watchtower's After-the-Fact Registration of Four Copyrights for One Video Should Not Be Considered for Purposes of Measuring Substantiality of Use

Watchtower argues that the JW Video comprises four distinct works, copyrights for which were registered on August 3, 2018.[17] Movant published the User Video on May 18, 2018,[18] and Watchtower published the JW Video (in the form Movant has provided to the Court) as a single work in July 2018.[19] When Movant made the User Video, and when the JW Video was first published, viewers were not on notice that Watchtower considered its film to be more than one work. It would be inequitable to measure "substantiality" for purposes of the third fair use element by the length of the un-demarcated video segments that Watchtower copyrighted later.

Again, this Court has found fair use even where a "great deal of plaintiff's work was copied, but such copying was plainly necessary to the commentary and critique." *Hosseinzadeh*, *supra*, 276 F.Supp.3d at 46. Watchtower claims that the User Video reproduced "approximately 90% of

---

[17] *See* Polidoro Decl., pp. 1-2, ¶ 5; p. 4, ¶ 21.
[18] *See* id., p. 3, ¶ 13.
[19] *See* Seymour Decl., p. 3, ¶ 13; Exh. 12.

the visual aspects and more than 50% of the audio aspect of the Never Alone music video"[20] (which was only retroactively identified as a separate work).  Watchtower misrepresents that Movant's commentary is limited to "ridiculing" the video's production value.[21]  Even if these were the percentages relevant to the fair use analysis – which Movant disputes – this Court has found fair use under similar circumstances.  *See id.* at 40 (defendant's 14-minute video used three minutes and fifteen seconds of plaintiff's five-minute and twenty-four second video, but "was harshly critical of [plaintiff's] video, and includes mockery of plaintiff's performance").

Watchtower exaggerates these factual quibbles to delay the Court's consideration of fair use, but the transformative nature of the User Video is readily apparent from a comparison of the two works, and the Court should decide this issue now, as a matter of law.

III.    <u>In the Alternative, the Court Should Grant Continued Leave to Proceed Anonymously</u>

If the Court wishes to allow discovery before adjudicating the question of fair use, it would be a prudent exercise of the Court's equitable powers to preserve Movant's anonymity until this defense can be finally determined.  Movant has suggested alternatives that would permit this case to proceed without inflicting the "injury litigated against" – a loss of anonymity.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2d Cir. 2008) (internal quotations omitted).  For one, the Court could hold this Motion in abeyance and allow limited discovery of facts necessary to resolve the question of fair use, without requiring disclosure of Movant's identity.  Movant has appeared in this proceeding and would not need to be served with further process.  Movant has also offered to receive a cease-and-desist letter through his undersigned counsel.

Watchtower's arguments against anonymity are unpersuasive and hypocritical.

---

[20] <u>WT Memo.</u>, p. 4.
[21] A cursory viewing of the User Video belies this statement.  *See, e.g.*, <u>Seymour Decl.</u>, Exh. 11 (User Video), at 9:13 (overdubbing music video with criticism of JW disciplinary practices); 9:44 (commenting on JW's stigmatization of beards); 9:50 (commenting on JW practice of disfellowshipping).

Watchtower contends that Movant has no expectation of privacy when publishing videos to an online forum like YouTube.  But unless and until he is found to have infringed Watchtower's copyright – which this Court decides, not Watchtower -- Movant has the same expectation of privacy when publishing pseudonymously on YouTube that Watchtower's missionaries had when they canvassed door-to-door in the Village of Stratton.  *See* Br. for Pet'rs, 17, *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, No. 00-1737 (U.S. Nov. 29, 2001) (extolling importance of anonymous discourse and warning against "persecution of those engaged in the secret distribution of information"); *Sony Music Entm't, Inc.*, *supra*, 326 F.Supp.2d at 562 ("[T]he First Amendment's protection extends to the Internet. . . . Internet anonymity facilitates the rich, diverse and far ranging exchange of ideas") (internal quotations and citations omitted).

Movant does not wish to prevent JWs from practicing their religion, or even from controversial practices like disfellowshipping.  He only seeks to prevent Watchtower's misuse of the DMCA subpoena mechanism to thwart protected speech.  The Court may acknowledge Movant's fear of disfellowshipping as cognizable harm without restricting Watchtower's ability to engage in that practice, just like it affords anonymity to prevent "reputational harm" without preventing speakers from making reputationally harmful remarks.  Because disclosure of Movant's identity would moot this case by inflicting the constitutional injury litigated against, and prejudice to Watchtower could be avoided by an appropriate equitable remedy, the Court should grant Movant leave to proceed anonymously if it does not quash the Subpoena.

## **CONCLUSION**

For the foregoing reasons, Movant respectfully requests that the Subpoena be quashed or, in the alternative, that Movant be allowed to remain anonymous in this and any subsequent proceedings, and such other, further and different relief as the Court deems just and proper.

FG:11324147.1

Dated: New York, New York
November 10, 2020

FOSTER GARVEY P.C.

By: /s/ Malcolm Seymour

Malcolm Seymour (MS-3107)
100 Wall Street, 20th Floor
New York, New York 10005-3708
(212) 965-4533
malcolm.seymour@foster.com

*Attorneys for Movant John Doe*

-11-